**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MFS SERIES TRUST I, on behalf of MFS VALUE FUND; MFS SERIES TRUST IV, on behalf of MFS BLENDED RESEARCH GLOBAL EQUITY FUND; MFS SERIES TRUST V, on behalf of MFS RESEARCH FUND and MFS TOTAL RETURN FUND; MFS SERIES TRUST VI, on behalf of MFS UTILITIES FUND; MFS SERIES TRUST X, on behalf of MFS BLENDED RESEARCH MID CAP EQUITY FUND and MFS BLENDED RESEARCH VALUE EQUITY FUND; MFS SERIES TRUST XI, on behalf of MFS MID CAP VALUE FUND and MFS BLENDED RESEARCH CORE EQUITY FUND; MFS SERIES TRUST XV, on behalf of MFS GLOBAL ALTERNATIVE STRATEGY FUND; MFS VARIABLE INSURANCE TRUST, on behalf of MFS VALUE SERIES, MFS UTILITIES SERIES, MFS TOTAL RETURN SERIES, and MFS RESEARCH SERIES; MFS VARIABLE INSURANCE TRUST II, on behalf of MFS BLENDED RESEARCH CORE EQUITY PORTFOLIO; MFS VARIABLE INSURANCE TRUST III, on behalf of MFS MID CAP VALUE PORTFOLIO; MFS MERIDIAN FUNDS, on behalf of U.S. VALUE FUND AND MANAGED WEALTH FUND; MFS INVESTMENT MANAGEMENT COMPANY (LUX), S.à.r.l, on behalf of BLENDED RESEARCH GLOBAL EQUITY FUND; and MFS HERITAGE TRUST COMPANY, as TRUSTEE FOR MFS LARGE CAP VALUE FUND,<br><br>         Plaintiffs,<br><br>    v.<br><br>FIRSTENERGY CORP.; CHARLES E. JONES; MICHAEL DOWLING; JAMES F. PEARSON; STEVEN E. STRAH; K. JON TAYLOR; DONALD R. SCHNEIDER; and JOHN JUDGE,<br><br>         Defendants. | Civil Case No. 2:21-cv-05839<br><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................ 2

II.   JURISDICTION AND VENUE ................................................................. 6

III.  PARTIES AND RELEVANT NON-PARTIES ......................................... 7

    A.    Plaintiffs ............................................................................................ 7

    B.    Defendants ...................................................................................... 10

    C.    Relevant Non-Parties Who Participated in the Illegal Scheme .......................... 13

IV.  DEFENDANTS CONCEALED THEIR ILLEGAL BRIBERY AND MONEY
    LAUNDERING SCHEME, AND ITS ATTENDANT RISKS TO THE
    COMPANY, FROM INVESTORS DURING THE RELEVANT PERIOD .................. 15

    A.    Defendants Concealed from Investors that FirstEnergy's "Legislative
         Efforts" and Potential "Legislative or Regulatory Solutions" to the
         Company's Problems Were Grounded in Illegal Conduct. ................................ 17

    B.    Defendants Concealed from Investors the Illegal Conduct Relating to the
         Passage of HB 6 and the Defeat of the Ensuing Ballot Initiative to Undue
         the Legislation. .............................................................................................. 25

    C.    Defendants Made False or Misleading Statements to Investors Regarding
         FirstEnergy's Purported Controls for Political Spending and 501(c)(4)
         Entities. ......................................................................................................... 42

    D.    Defendants Made False or Misleading Statements to Investors Regarding
         the Legal Risks Associated with FirstEnergy's Lobbying Activities. ................ 46

    E.    Defendants Made False or Misleading Statements to Investors Regarding
         FirstEnergy's Internal Controls and Corporate Governance. ........................... 47

V.   REVELATIONS IN JULY 2020 AND LATER REGARDING DEFENDANTS'
    UNLAWFUL CONDUCT CAUSED THE VALUE OF THE MFS FUNDS'
    INVESTMENTS IN FIRSTENERGY STOCK TO DECLINE .................................... 52

    A.    The Market First Learned About the Bribery and Money Laundering
         Scheme Involving FirstEnergy on July 21, 2020. ............................................ 52

    B.    Additional Facts Relating to the Unlawful Scheme Were Revealed in
         October and November 2020. ......................................................................... 56

    C.    Additional Developments After the Relevant Period Further Demonstrate
         Defendants' Wrongdoing and the Harm It Caused to Investors. ...................... 62

VI.  PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ................... 64

VII.  DEFENDANTS ACTED WITH SCIENTER ................................................................ 66

    A.    Jones's Scienter ............................................................................................. 68

    B.    Dowling's Scienter ........................................................................................ 72

i

C.      Pearson's Scienter ............................................................................................... 75

D.      Strah's Scienter ................................................................................................... 77

E.      Taylor's Scienter ................................................................................................. 78

F.      Schneider's Scienter............................................................................................ 78

G.      Judge's Scienter .................................................................................................. 79

VIII.   CLAIMS FOR RELIEF ................................................................................................. 80

IX.     PRAYER FOR RELIEF ................................................................................................. 83

X.      JURY DEMAND ............................................................................................................ 83

The MFS Plaintiffs (identified below) ("Plaintiffs"), by and through their undersigned counsel, bring this action under the Securities Exchange Act of 1934 ("Exchange Act") against FirstEnergy Corp. ("FirstEnergy" or the "Company"), as well as certain current and former FirstEnergy executives (identified below, and together with FirstEnergy, "Defendants"), to recover damages arising from purchases of FirstEnergy stock between February 21, 2017 and July 21, 2020, inclusive ("Relevant Period").  Plaintiffs' allegations are informed by, among other things:

- Documents FirstEnergy filed with the U.S. Securities and Exchange Commission ("SEC");

- Press releases issued by FirstEnergy;

- Transcripts of FirstEnergy conference calls with analysts and investors;

- Publicly available media articles regarding FirstEnergy;

- Securities analysts' reports regarding FirstEnergy; and

- Documents made public through criminal cases brought by the United States and civil cases brought by the State of Ohio, certain city governments, consumers, and investors.[1]

In particular, on July 22, 2021, FirstEnergy entered into a deferred prosecution agreement under which the Company acknowledged and agreed that the United States Attorney's Office for the Southern District of Ohio would file the accompanying Information in the United States District Court for the Southern District of Ohio charging FirstEnergy with conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1349.  *See United States v. FirstEnergy Corp.*, No. 1:21-cr-86, ECF No. 3 (S.D. Ohio July 22, 2021) ("Deferred Prosecution Agreement" or "DPA").  Further, in connection with the Deferred Prosecution

---

[1] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations and quotation marks have been omitted.

Agreement, FirstEnergy "admits, accepts, and acknowledges that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts" attached to the Deferred Prosecution Agreement ("DPA SOF"), and "that the facts alleged in the Information and described in the Statement of Facts are true and accurate."[2] FirstEnergy agreed that the Statement of Facts establishes the elements of conspiracy to commit honest services wire fraud, including that "two or more persons conspired or agreed to devise a scheme" to "defraud the public of its right to the honest services of a public official through bribery or kickbacks," which "included a material misrepresentation or concealment of a material fact," and was done "with the intent to defraud"; and that FirstEnergy "knowingly and voluntarily joined the conspiracy to defraud" and "intentionally participated in the conspiracy to defraud."[3]

## I.    NATURE OF THE ACTION

1.      The facts giving rise to Plaintiffs' claims are striking.  Throughout the Relevant Period, FirstEnergy—led by its then-Chief Executive Officer ("CEO") Charles E. (Chuck) Jones and other senior executives—was part of a criminal enterprise, engaging in a massive bribery and money laundering scheme to pay tens of millions of dollars to Ohio public officials in exchange for official acts done to benefit the Company.

2.      The illegal scheme began in late 2016, when the subsidiaries responsible for FirstEnergy's nuclear plants in Ohio—FirstEnergy Solutions Corp. and FirstEnergy Nuclear Operating Company—were on the brink of insolvency.  Those entities needed government assistance, and Defendants were willing to brazenly violate the law to get it.  In particular, between March 2017 and March 2020, Defendants made, funded, or facilitated approximately

---

[2] DPA at 1.

[3] *Id.* at 1-2.

$60 million in secret payments to then-Speaker of the Ohio House of Representatives Larry Householder and to Samuel Randazzo, Chairman of the Public Utilities Commission of Ohio ("PUCO"), in order to buy legislative and regulatory favors, including a billion-dollar legislative relief package called House Bill 6 ("HB 6").[4]  In announcing the indictments of Householder and others on federal racketeering charges on July 21, 2020, the U.S. Attorney for the Southern District of Ohio, David DeVillers, described the misconduct as "likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio."[5]

3.       In addition to harming millions of Ohio residents and perverting the Ohio legislative and regulatory process, Defendants' misconduct damaged innocent investors in FirstEnergy securities, including Plaintiffs, who were unaware of Defendants' illegal acts and the significant undisclosed risks to which those acts exposed the Company.

4.       Defendants concealed the payments to Householder and Randazzo from investors and the general public through several methods.  Among other things, FirstEnergy and its affiliates coordinated with Householder and his associates to make approximately $60 million of concealed, nonpublic payments to a 501(c)(4) entity called "Generation Now," which Householder controlled.  Defendants also set up their own 501(c)(4) entity, "Partners for Progress," to further conceal FirstEnergy as the true source of more than $15 million in payments

---

[4] DPA SOF at 16 (payments of more than $59 million from FES (of which more than $16.9 million was attributed to FirstEnergy and more than $43 million was attributed to FES) to Householder's 501(c)(4) entity, Generation Now); *id.* at 24-25 ($500,000 payment by FirstEnergy to another dark money group, for Householder's benefit); *id.* at 35 ($4,333,333 payment by FirstEnergy to company owned by Randazzo, for Randazzo's benefit).

[5] Don Horn, Sharon Coolidge, Jessie Balmert, *Ohio House Speaker Larry Householder arrested in $60 million bribery case*, THE CINCINNATI ENQUIRER, July 21, 2020, available at https://www.cincinnati.com/story/news/2020/07/21/ohio-bribery-case-state-official-charged-federal-prosecutors/5477862002/.

to Generation Now.  FirstEnergy was the sole funder of Partners for Progress, but FirstEnergy

investors had no way of knowing that.

5.      Indeed, as FirstEnergy has since admitted in a July 22, 2021 press release issued

in accordance with the Deferred Prosecution Agreement:

> Central to FirstEnergy Corp.'s effort to influence the legislative process in Ohio
> was the use of 501(c)(4) corporate entities.  FirstEnergy Corp. used the 501(c)(4)
> corporate form as a mechanism to conceal payments for the benefit of public
> officials and in return for official action.  FirstEnergy Corp. used 501(c)(4)
> entities in this way because the law does not require disclosure of donors to a
> 501(c)(4) and there is no ceiling that limits the amount of expenditures that can
> be paid to a 501(c)(4) entity for the purpose of influencing the legislative process.
> This effort would not have been possible, both in the nature and volume of money
> provided, without the use of a 501(c)(4) entity.

6.      Defendants also schemed to conceal a $4.3 million payment to Randazzo in 2019

by improperly treating it as a contractual payment to a vendor company for a service.  In fact,

Randazzo was the sole owner of the vendor company and FirstEnergy had no contractual

obligation or any other lawful obligation to make the payment.  A 2015 contractual amendment

was used as an excuse for the payment but the amendment was never executed, and Randazzo

never provided the services for the payment (the $4.3 million discussed in the unsigned

amendment was for future years of possible service that Randazzo could not ethically perform

while serving as a PUCO commissioner).  In reality, as detailed below, the unnecessary payment

was a bribe paid in exchange for Randazzo's commitment to take actions as PUCO Chairman to

benefit FirstEnergy.

7.      While knowingly engaging in these and other unlawful acts, Defendants

repeatedly represented to investors that FirstEnergy's lobbying activities complied with

applicable law, were ethical, and were in the Company's best interests.  Further, when describing

to investors specific legislative and regulatory efforts by Householder and Randazzo (including

the passage of HB 6 and several favorable decisions by PUCO), Defendants noted only the

4

benefits of the policy actions to FirstEnergy and falsely suggested those two public officials had independently acted based on the merits of the Company's policy arguments.

8.     Defendants also made misrepresentations to investors regarding the strength of FirstEnergy's Corporate Political Activity Policy[6] as well as the Company's corporate governance and internal controls.  In fact, those policies and controls failed due to a "material weakness" at the very top of the organization, which the Company has admitted:

> We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top.  Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct.[7]

9.     In short, Defendants' numerous misstatements and omissions of material facts conveyed a fundamental misimpression to investors about FirstEnergy's business operations and financial prospects: specifically, that FirstEnergy was engaged in routine and legal corporate lobbying and had received a valuable relief package from the Ohio state government that would span years.  In fact, due to FirstEnergy's concealed unlawful scheme, the relief package was a house of cards.

10.     On July 21, 2020, the collapse began when FBI agents arrested Householder and several accomplices, and federal prosecutors released a detailed criminal complaint explaining how approximately $60 million in payments to Householder's Generation Now entity had purchased his support for HB 6.  On the same day, FirstEnergy disclosed that it had received

---

[6] The FirstEnergy Corporate Political Activity Policy states, in pertinent part: "FirstEnergy has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy."  *See infra* ¶ 116 et seq.

[7] FirstEnergy Form 10-K/A filed on November 19, 2020.

subpoenas relating to the federal investigation into HB 6.  In response to those revelations, FirstEnergy's stock price dropped 34%, from $41.26 at the close of trading on July 20 to $27.09 at the close of trading on July 22, on extraordinary trading volume of 176,970,700 shares over two days.

11.     Those revelations, it turned out, were only the beginning.  Through a series of additional disclosures in the fall of 2020, investors learned the full nature and scope of FirstEnergy's illegal conduct as well as the attendant risks to which the Company was exposed. In total, FirstEnergy lost approximately $10 billion in market capitalization as a result of those disclosures.

12.     Through this action brought under Sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5, Plaintiffs seek to recover the significant damages resulting from Defendants' fraud in connection with the MFS Funds' purchases of FirstEnergy stock.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action in accordance with Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.     Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act and the Fifth Amendment of the United States Constitution.

15.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391.  The acts and events described in this Complaint, including the dissemination of false or misleading information, occurred in substantial part in this District.  Further, in connection with the Deferred Prosecution Agreement, FirstEnergy admitted that "some or all of

the acts alleged in the Information occurred in the Southern District of Ohio, on or about the dates alleged in the Information."[8]

16.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiffs

17.     Plaintiff **MFS Series Trust I** is a business trust organized under the laws of the Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as an open-end management investment company.  The Trust asserts claims on behalf of MFS Value Fund, a series of MFS Series Trust I.

18.     Plaintiff **MFS Series Trust IV** is a business trust organized under the laws of the Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as an open-end management investment company.  The Trust asserts claims on behalf of MFS Blended Research Global Equity Fund, which was a series of MFS Series Trust IV during the Relevant Period.

19.     Plaintiff **MFS Series Trust V** is a business trust organized under the laws of the Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as an open-end management investment company.  The Trust asserts claims on behalf of MFS Research Fund and MFS Total Return Fund, each a series of MFS Series Trust V.

20.     Plaintiff **MFS Series Trust VI** is a business trust organized under the laws of the Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as

---

[8] DPA at 2.

an open-end management investment company.  The Trust asserts claims on behalf of MFS

Utilities Fund, a series of MFS Series Trust VI.

21.     Plaintiff **MFS Series Trust X** is a business trust organized under the laws of the

Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as

an open-end management investment company.  The Trust asserts claims on behalf of MFS

Blended Research Mid Cap Equity Fund and MFS Blended Research Value Equity Fund, each a

series of MFS Series Trust X.

22.     Plaintiff **MFS Series Trust XI** is a business trust organized under the laws of the

Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as

an open-end management investment company.  The Trust asserts claims on behalf of MFS Mid

Cap Value Fund and MFS Blended Research Core Equity Fund, each a series of MFS Series

Trust XI.

23.     Plaintiff **MFS Series Trust XV** is a business trust organized under the laws of the

Commonwealth of Massachusetts and registered under the Investment Company Act of 1940 as

an open-end management investment company.  The Trust asserts claims on behalf of MFS

Global Alternative Strategy Fund, a series of MFS Series Trust XV.

24.     Plaintiff **MFS Variable Insurance Trust** is a business trust organized under the

laws of the Commonwealth of Massachusetts and registered under the Investment Company Act

of 1940 as an open-end management investment company.  The Trust asserts claims on behalf of

MFS Value Series, MFS Utilities Series, MFS Total Return Series, and MFS Research Series,

each a series of MFS Variable Insurance Trust.

25.     Plaintiff **MFS Variable Insurance Trust II** is a business trust organized under

the laws of the Commonwealth of Massachusetts and registered under the Investment Company

8

Act of 1940 as an open-end management investment company. The Trust asserts claims on behalf of MFS Blended Research Core Equity Portfolio, a series of MFS Variable Insurance Trust II.

26. Plaintiff **MFS Variable Insurance Trust III** is a statutory trust organized under the laws of the State of Delaware and registered under the Investment Company Act of 1940 as an open-end management investment company. The Trust asserts claims on behalf of MFS Mid Cap Value Portfolio, a series of MFS Variable Insurance Trust III.

27. Plaintiff **MFS Meridian Funds** is an investment company with variable capital (Société d'Investissement à Capital Variable or "SICAV") established in Luxembourg. MFS Meridian Funds asserts claims on behalf of U.S. Value Fund and Managed Wealth Fund, each a compartment of MFS Meridian Funds.

28. Plaintiff **MFS Investment Management Company (Lux), S.à.r.l** ("MFS Lux") is a Luxembourg limited company registered as an asset manager under the Luxembourg Law of 17 December 2010. MFS Lux asserts claims on behalf of Blended Research Global Equity Fund, a compartment of MFS Investment Funds, which is an umbrella fund established in Luxembourg in non-corporate form as a *fonds commun de placement* (FCP) for which MFS Lux serves as management company.

29. Plaintiff **MFS Heritage Trust Company** is a New Hampshire non-depository trust company that is the trustee of the MFS Heritage Trust Company Collective Investment Trust. MFS Heritage Trust Company asserts claims in its role as trustee for MFS Large Cap Value Fund, a collective investment trust of the MFS Heritage Trust Company Collective Investment Trust.

9

30.     MFS Value Fund, MFS Blended Research Global Equity Fund, MFS Research Fund, MFS Total Return Fund, MFS Utilities Fund, MFS Blended Research Mid Cap Equity Fund, MFS Blended Research Value Equity Fund, MFS Mid Cap Value Fund, MFS Blended Research Core Equity Fund, MFS Global Alternative Strategy Fund, MFS Value Series, MFS Utilities Series, MFS Total Return Series, MFS Research Series, MFS Blended Research Core Equity Portfolio, MFS Mid Cap Value Portfolio, U.S. Value Fund, Managed Wealth Fund, Blended Research Global Equity Fund, and MFS Large Cap Value Fund are referenced collectively in this Complaint as the "MFS Funds."

**B.     Defendants**

31.     Defendant **FirstEnergy Corp.** is an electric utility company headquartered in Akron, Ohio with subsidiaries and affiliates involved in the distribution, transmission and generation of electricity, as well as energy management and other energy-related services.  Its ten electric utility operating companies comprise one of the United States' largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey, and New York.  The Company's common stock is listed on the NYSE under the ticker symbol "FE."

32.     During the Relevant Period, FirstEnergy was the parent company to, among others, the entity formerly known as FirstEnergy Solutions Corp. ("FES") and FES subsidiary FirstEnergy Nuclear Operating Company ("FENOC"), which operated FirstEnergy's nuclear plants, including the Ohio-based Davis-Besse Nuclear Power Station and Perry Nuclear Power Plant.  On March 31, 2018, FES and FENOC filed for Chapter 11 bankruptcy protection, and emerged from bankruptcy in 2020 as Energy Harbor Corp.  FirstEnergy also serves as the parent company for FirstEnergy Service Company ("FirstEnergy Service"), which provided legal, financial, and other corporate support services to FirstEnergy and its subsidiaries.

10

33.     FES was dependent on FirstEnergy.  Indeed, the bankruptcy court described the two entities as "joined at the hip" and noted FES was "utterly incapable" of operating without the shared services agreement it entered into with FirstEnergy as part of the bankruptcy.[9]

34.     Defendant **Charles E. (Chuck) Jones** served as CEO and a director of FirstEnergy during the Relevant Period.  The Company terminated his employment in October 2020.

35.     Defendant **Michael Dowling** served as FirstEnergy's Senior Vice President ("SVP") of External Affairs during the Relevant Period.  The Company terminated his employment in October 2020.

36.     In announcing its "Leadership Transition" on October 29, 2020, FirstEnergy stated that, during the course of the Company's "internal review related to the government investigations," the Independent Review Committee of the Company's board of directors determined that Jones and Dowling "violated certain FirstEnergy policies and its code of conduct."

37.     Defendant **James F. Pearson** served as FirstEnergy's Chief Financial Officer ("CFO") until March 2018, when he transitioned to FirstEnergy's Vice President of Finance until he retired in April 2019.

38.     Defendant **Steven E. Strah** was appointed Acting CEO of FirstEnergy in October 2020, following Jones's termination.  Strah previously served as President of the Company since May 2020, before that as CFO beginning in March 2018, and before that as SVP of FirstEnergy's Utilities Operations.

---

[9] *See In re LLC Energy Harbor, Pleasants Corp.*, No. 5:18-BK-50757, ECF No. 3135 (Bankr. N.D. Ohio Aug. 29, 2019).

39. Defendant **K. Jon Taylor** became FirstEnergy's CFO after Strah. Taylor previously served as the Company's Controller and Chief Accounting Officer, and as President of FirstEnergy's Ohio Operations and Vice President of Utilities Operations.

40. Defendant **Donald R. Schneider** served as CEO and Chairman of FES during the Relevant Period until March 2019. Schneider remained Chairman of FES until FES emerged from bankruptcy as Energy Harbor in 2020.

41. Defendant **John Judge** has been the CEO and President of Energy Harbor since February 2019. He previously served as Chief Risk Officer of FirstEnergy.

42. The individuals referenced in ¶¶ 33-40 above are collectively referred to as the "Individual Defendants," and are referred to along with FirstEnergy as "Defendants."

43. Aside from Defendant Dowling (whose liability is based on participation with the other Defendants in a fraudulent scheme), these Defendants (1) signed FirstEnergy SEC filings containing false or misleading statements during the Relevant Period, as identified in the below chart; and/or (2) otherwise made false or misleading statements during the Relevant Period, as detailed in Section IV below.

| Filing | Date | Signing Defendants |
| --- | --- | --- |
| 2016 Form 10-K | 2/21/2017 | Jones, Schneider, Pearson, Taylor |
| Q1 2017 Form 10-Q | 4/27/2017 | Jones, Schneider, Pearson, Taylor |
| Q2 2017 Form 10-Q | 7/27/2017 | Jones, Schneider, Pearson, Taylor |
| Q3 2017 Form 10-Q | 10/26/2017 | Jones, Schneider, Pearson, Taylor |
| 2017 Form 10-K | 2/20/2018 | Jones, Schneider, Pearson, Taylor |
| Q1 2018 Form 10-Q | 4/23/2018 | Jones, Strah |
| Q2 2018 Form 10-Q | 7/31/2018 | Jones, Strah |
| Q3 2018 Form 10-Q | 10/25/2018 | Jones, Strah |
| 2018 Form 10-K | 2/19/2019 | Jones, Strah |
| Q1 2019 Form 10-Q | 4/23/2019 | Jones, Strah |
| Q2 2019 Form 10-Q | 7/23/2019 | Jones, Strah |
| Q3 2019 Form 10-Q | 11/4/2019 | Jones, Strah |
| 2019 Form 10-K | 2/10/2020 | Jones, Strah |
| Q1 2020 Form 10-Q | 4/23/2020 | Jones, Strah |

C.     **Relevant Non-Parties Who Participated in the Illegal Scheme**

44.     **Larry Householder** served as a representative of Ohio's 72nd District from January 2017 until June 16, 2021, when the Ohio House voted to expel him.  Householder also served as Speaker of the Ohio House from January 7, 2019 to July 30, 2020.  On July 21, 2020, Householder was arrested and charged in connection with the illegal bribery and money laundering scheme to which FirstEnergy has since admitted.  FirstEnergy has admitted that "[b]etween 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES) to Generation Now—a purported 501(c)(4), which FirstEnergy Corp. knew was operated for the benefit of and controlled by [Householder], upon its inception in early 2017."[10]  FirstEnergy paid that money to Householder "in return for [Householder] pursuing nuclear legislation for FirstEnergy Corp.'s benefit in his capacity as a public official."[11]

45.     **Samuel Randazzo** served as Chairman of PUCO—which regulates FirstEnergy's Ohio subsidiaries—from April 2019 until November 20, 2020, when he resigned amid the fallout from revelations regarding the bribery and money laundering scheme he helped orchestrate.  FirstEnergy has admitted that it "paid $4.3 million dollars to [Randazzo] through his consulting company in return for [Randazzo] performing official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose."[12]

---

[10] DPA SOF at 16.  In the Statement of Facts, Householder is referred to as "Public Official A."

[11] *Id.* at 17.

[12] *Id.*  In the Statement of Facts, Randazzo is referred to as "Public Official B."

46.     **Generation Now, Inc.** was a Delaware Not-For-Profit Corporation that Householder controlled.  FirstEnergy and its affiliates paid Generation Now approximately $60 million dollars in exchange for official actions by Householder.  Generation Now has since pleaded guilty to a charge of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), in connection with its role in the bribery and money laundering scheme detailed in this Complaint.

47.     **Jeffrey Longstreth** was Householder's longtime campaign and political strategist and one of his closest advisors.  Longstreth was the signatory on Generation Now's bank accounts and the person who transferred money out of the accounts to carry out Householder's wishes.  Longstreth has pleaded guilty to a charge of violating RICO in connection with his role in facilitating the bribes made by FirstEnergy and its affiliates.

48.     **Neil Clark** was the owner and operator of Grant Street Consultants, an Ohio-based lobbying firm that focused on legislative, regulatory, and procurement lobbying at the Ohio Statehouse.  Federal investigators appear to have wiretapped Clark's phone line in connection with their investigation of Householder.  In recordings, Clark described himself as Householder's "hit man" who would do the "dirty sh[--]."  Other conspirators are allegedly recorded describing Clark as Householder's "proxy" relating to FirstEnergy matters.  The federal government charged Clark as a RICO conspirator, after which he reportedly committed suicide.

49.     **Matthew Borges** was a registered lobbyist for FES whom the federal government alleges was a key middleman at the center of the effort by Householder and his conspirators to affect the results of a referendum to stop HB 6 from taking effect.  The federal government has charged Borges for his role in the bribery of Householder.

50. **Juan Cespedes** was a lobbyist who allegedly coordinated some of FirstEnergy's illicit payments to Generation Now. Cespedes has pleaded guilty to a charge of violating RICO in connection with his role in facilitating the bribes to Householder by FirstEnergy and its affiliates.

## IV. DEFENDANTS CONCEALED THEIR ILLEGAL BRIBERY AND MONEY LAUNDERING SCHEME, AND ITS ATTENDANT RISKS TO THE COMPANY, FROM INVESTORS DURING THE RELEVANT PERIOD

51. Defendants' illegal conduct grew out of the difficulties FirstEnergy was facing in 2016. In its Form 10-Q for the third quarter of 2016, filed on November 4, 2016, FirstEnergy reported "[d]epressed prices in the wholesale energy and capacity markets," poor forecast demands, and hundreds of millions of dollars in losses, particularly from FES. FirstEnergy stated future options for its generation portfolio consisted of legislative and regulatory solutions for generation asset sales and plant deactivations, restructuring debt, or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

52. Additionally, in its 2016 Form 10-K filed on February 21, 2017, FirstEnergy reported a "substantial uncertainty as to FES' ability to continue as a going concern and substantial risk that it may be necessary for FES, and possibly FENOC, to seek protection under U.S. bankruptcy laws, which would have a material adverse impact on FirstEnergy's and FES' business, financial condition, results of operations and cash flows." (Capitalization omitted.) The Company further stated in the 2016 Form 10-K that "[b]ased upon continued depressed prices in the wholesale energy and capacity markets, weak demand for electricity and anemic demand forecasts, FES' cash flow from operations may be insufficient to repay its indebtedness or trade payables in the long-term."

53. The severe problems facing FirstEnergy stemmed in part from two failing Ohio-based nuclear power plants—the Perry Nuclear Generating Station and the Davis-Besse Nuclear

Power Station (collectively, the "Nuclear Plants")—which FirstEnergy owned and operated through its wholly owned subsidiaries FES and FENOC.  These plants were failing because of a mix of declining demand for nuclear energy (due to pressure from cheaper energy alternatives) and because FirstEnergy and its affiliates had failed to properly implement corrosion controls, leading to prolonged outages at the Davis-Besse plant in Oak Harbor, Ohio for several years in the early to mid-2000s.

54.     The significant challenges facing FirstEnergy and its affiliates led Defendants to devise a means to achieve a legislative or regulatory fix.  To that end, in 2017 and 2018 FirstEnergy attempted to seek relief through the federal government, meeting with federal officials and hiring consultants with close connections to federal officials "to lobby and assist in securing official action to subsidize the nuclear and coal plants through DOE [i.e., Department of Energy] action and the FERC [i.e., Federal Energy Regulatory Commission] rulemaking process."[13]  Additionally, "FirstEnergy Service [] approved a $5,000,000 wire to a 501(c)(4) entity connected to federal official(s), on or about May 1, 2017, shortly after hiring a consultant with close connections to those federal official(s)."[14]

55.     Despite setting up that infrastructure to attempt to achieve a federal solution, FirstEnergy ultimately believed those efforts might not be successful.  The Company accordingly trained its focus on the State of Ohio, where it already had been "purs[u]ing state legislation . . . to save the power plants through help from [Householder]," including the Zero-Emissions Nuclear Resource Program (or ZEN) energy proposals outlined in several bills in 2017.  These

---

[13] DPA SOF at 20.

[14] *Id.*

16

bills failed to gain the requisite support before Householder became Ohio House Speaker in 2019.[15]

56.     During this time, while Defendants informed investors that, among other things, FirstEnergy was "continuing with legislative efforts to explore a regulatory type solution,"[16] Defendants concealed the illegal means through which they were pursuing those legislative and regulatory remedies.

57.     In that regard, throughout the Relevant Period, Defendants made numerous false or misleading representations to investors, which fell into five general categories: (1) statements regarding the Company's legislative efforts; (2) statements regarding HB 6 and the ensuing ballot initiative aimed at rescinding the law; (3) statements regarding the Company's purported controls with respect to political spending and activities relating to 501(c)(4) entities; (4) statements regarding risks relating to the Company's purported lobbying activities; and (5) statements regarding the purported sufficiency of the Company's internal controls and corporate governance policies.  Subsequent disclosures revealed that all of those representations either affirmatively misstated material facts or misleadingly failed to disclose material facts.

**A.     Defendants Concealed from Investors that FirstEnergy's "Legislative Efforts" and Potential "Legislative or Regulatory Solutions" to the Company's Problems Were Grounded in Illegal Conduct.**

**1.     Defendants made numerous statements to investors regarding FirstEnergy's pursuit of legislative or regulatory measures that would benefit the Company.**

58.     During the Relevant Period, Defendants made numerous representations to investors regarding FirstEnergy's efforts to obtain legislation or regulatory action favorable to

---

[15] *Id.*

[16] *E.g.*, FirstEnergy 2016 Form 10-K (filed on Feb. 21, 2017) at 29.

the Company, while making no mention of the illicit means through which Defendants were securing those benefits.  Defendants also specifically referenced HB 6 on numerous occasions, and failed to disclose to investors that the Company's efforts in helping secure the bill's passage were rooted in bribery and money laundering.

59.     In its 2016 Form 10-K filed on February 21, 2017, FirstEnergy stated that while it was "targeting mid-2018 to exit from competitive operations"—which included its nuclear plants—"the options to exit" could include "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits."[17]  The Company further stated management was, among other things, "continuing with legislative efforts to explore a regulatory type solution."  The Company made nearly identical statements in its (1) Form 10-Q filed on April 27, 2017; (2) Form 10-Q filed on July 27, 2017; and (3) Form 10-Q filed on October 26, 2017.

60.     Defendant Chuck Jones also repeatedly mischaracterized FirstEnergy's legislative and regulatory efforts.  On February 22, 2017, for example, Jones stated during an earnings call that "[i]n Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security."  He added:

> Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. . . .
>
> We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [the Company] won't be the long-term owner of these assets. ***We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds***. . . .

---

[17] FirstEnergy's "competitive operations" included its nuclear plants.  The Company's 2016 Annual Report states: "As competitive energy markets continued to devalue baseload coal and nuclear generation, we announced our intention to exit these markets and transition to a fully regulated company."

Here's what I said in my prepared remarks and I'll elaborate on it a little bit. I think that it is very important for the state of Ohio to look to the future and how they're going to provide for energy security, grid security, and not just from an electric perspective, the economic impact in terms of jobs and taxes and so forth that are associated with these two facilities. ***I've been very up front with the legislators that I have met with personally to tell them don't do this for FirstEnergy because it's unlikely we're going to be the long-term owner-operators of these assets***.

61.     Jones, Schneider, and Pearson made similar statements over the following

months, as identified below:

| Date | Source | Statement |
|------|--------|-----------|
| 3/15/2017 | FirstEnergy Annual Report, Letter Signed by Defendant Jones | "[W]e're participating in legislative efforts in Ohio and Pennsylvania that recognize the environmental and energy security benefits of our baseload nuclear plants." |
| 4/28/2017 | Defendant Jones during FirstEnergy Earnings Call | "[W]e are closely monitoring 2 important new developments at the state and federal level. ***On the legislative front, bills were introduced in both the Ohio House and Senate this month that could help keep nuclear assets as part of Ohio's generation mix***." <br><br> "The Zero Emission Nuclear Resource Program, or ZEN, is intended to recognize the critical energy security environmental attributes of nuclear power plants in Ohio by compensating them on a per megawatt hour basis. . . . I had the opportunity to testify at the initial hearing on ZEN which was held in the Ohio House earlier this week. Multiple hearings are expected in each chamber prior to summer recess, and we are working to get a bill on the governor's desk as quickly as possible." |
| 5/17/2017 | *Akron Beacon Journal* quoting Defendant Jones | "[R]egardless of whether FirstEnergy continues to own its generating plants by the time the ZEN legislation could pass, 'it needs to happen and it needs to happen regardless of when it happens,' and [Jones] will continue to fight for it." |
| 7/28/2017 | Defendant Jones during FirstEnergy Earnings Call | "I am going to continue to fight for this ZEN legislation because it is the right thing to do for the state of Ohio. It's the right thing to do for those assets. It gives those assets the best chance of running under new owners. I'm not sure those assets will run unless there is something done either federally or by the state of Ohio to ensure that they get a |

19

| | | different financial return model, and that's bad. So we're going to continue to work on ZEN whether or not – irrespective of what happens with FES." |
|---|---|---|
| 9/7/2017 | Defendant Pearson during Barclays CEO Energy-Power Conference | "We continue to advocate the benefits of having those plants running . . . . [W]e're going to continue to educate all the constituents in Ohio. And hopefully, we'll be able to get some type of legislation introduced in Ohio as well as supported by the [G]overnor." |
| 10/27/2017 | Defendant Jones during FirstEnergy Earnings Call | "While the Ohio legislature was on recess this summer, we continued working on a modified approach to help compensate the state's nuclear plants for the fuel diversity, environmental and other benefits that they provide. . . ."<br><br>"I think the fact that New York and Illinois have already taken measures to protect these fuel-secured nuclear facilities in particular. The DOE initiative on top of it, the fact that other states concurrently are looking at it all are creating an awareness about what's going on in our nation and the importance of these assets to not only physical security but also economic security. So I don't think it's a surprise that Ohio is willing to relook at it. I think we've got to deal with the legislature first. And then once we have the legislature passing the bill, then we'll see where the governor really is at that time." |
| 2/21/2018 | Defendant Jones during FirstEnergy Earnings Call | "***FES will continue to look at all options regarding these units, and we will continue to support policy solutions***. However, . . . we have fully impaired our nuclear assets because the inability to receive any form of legislative or regulatory support has increased the likelihood that the plants will not be able to operate until the end of their useful lives." |
| 3/31/2018 | FES Press Release quoting Defendant Schneider | "Given the prospective timing of federal and state review and our ongoing cash needs and debt service obligations, the FES and FENOC Boards of Directors determined that the Chapter 11 filing represents our best path forward ***as we continue to pursue opportunities for*** restructuring, asset sales and ***legislative and regulatory relief***." |
| 4/23/2018 | FirstEnergy Investor Presentation | "We will continue to advocate for regulatory or legislative solutions that recognize the attributes of baseload generation and to ensure our customers continue to have a stable, reliable power supply." |

| 4/23/2018 | Defendant Jones during FirstEnergy Earnings Call | "We understand the importance of these plants to the regional economy and recognize that more than 5 million of our utility customers are still exposed to the uncertainty of competitive markets. Therefore, ***I will continue personally to advocate for regulatory or legislative solutions***, including FES' application for an emergency order under the Federal Power Act that recognize the attributes of fuel-secure baseload generation and to ensure our customers continue to have a stable, reliable power supply. I continue to believe we are doing long-term damage to our nation's infrastructure, and I intend to be a steady voice in pushing for more integrated policies and decision-making." |
|---|---|---|
| 6/1/2018 | *Cleveland.com* Article quoting Defendant Jones | "The company has advocated for solutions that recognize the critical attributes coal and nuclear plants provide because preserving these vital facilities is the right thing to do for the industry, the electric grid and our customers." |
| 8/1/2018 | Defendant Jones during FirstEnergy Earnings Call | "So any thoughts around the future of those assets are now questions to be posed to FES. I would say that, from my perspective, I continue to feel that the market policies in our countries have severe flaws that closing perfectly good nuclear plants in the long run is not going to be a good thing for our country. In the long-run, it's not going to be a good thing for the 6 million customers that I'm paid to look out for. Because I think having a diverse mix of generation provides the more secure future for those customers from both physical security, grid resiliency and an economic stability perspective. ***So to the extent my voice matters in this process, I'm going to continue to be a loud advocate for it. I do believe that the deferred (inaudible) is still very seriously looking at this issue. And we are hopeful that they intend – that they will eventually step forward and do something to stabilize it.***" |
| 12/17/2018 | *Crains Cleveland Business* quoting Defendant Schneider | "The Chapter 11 filing represents our best path forward as we continue to pursue opportunities for restructuring, asset sales and ***legislative and regulatory relief***." |
| 2/20/2019 | Defendant Jones during FirstEnergy Earnings Call | "Obviously if our new leaders of the states; we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission; if they determine that they think the time is right to really put energy policy for the state back on the table in some fashion legislatively, then we would expect to engage and provide |

| | | our input. But it's too early in the process for me to talk about what that might mean." |
| | | |

### 2. Defendants' representations were false or misleading in light of the illegal conduct through which they sought to achieve favorable legislation or regulatory action.

62.     Investors had no idea that the "legislative efforts" and "solutions" Defendants were pursuing consisted of illegal bribes and money laundering.  In 2017 and 2018, FirstEnergy bribed Larry Householder by providing millions of dollars in financial assistance to his campaign to serve as Speaker of the Ohio House of Representatives.

63.     As FirstEnergy has now admitted, "[c]entral to [the Company]'s state solution strategy was payments for [Householder]'s benefit to Generation Now, . . . as [Householder] pursued the Ohio House Speakership."[18]  Those payments "began in 2017, as [Householder] began executing his strategy to regain the Speakership."[19]  Further:

> This was consistent with the strategy that [Defendant Dowling] had outlined in an internal presentation, explaining that 2017 political contributions are "strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation" and that FirstEnergy Corp.'s "preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from."  The presentation noted that "the bulk of our contribution decisions are to c(4)s."[20]

64.     To implement that strategy, in 2017, FirstEnergy, through FirstEnergy Service, wired $1,000,000 to Generation Now, consisting of four quarterly payments for Householder's benefit, following his trip to Washington, D.C. with FirstEnergy executives for Donald Trump's

---

[18] DPA SOF at 21.

[19] *Id.*

[20] *Id.*  Unless otherwise indicated, italics used in the Statement of Facts have been omitted from this Complaint.

presidential inauguration.[21]  FirstEnergy has admitted those payments "were intended to

contribute to [Householder]'s power and visibility for the speakership and allowed him to

support other candidates who would in turn support his speakership," and in return, FirstEnergy

"expected and intended that [Householder] and his team would further FirstEnergy Corp.'s

efforts to save the power plants."[22]

65.     FirstEnergy continued contributing to Generation Now for Householder's benefit,

but in 2018 moved from sending money directly from FirstEnergy Service to sending payments

through Partners for Progress, which had been fully funded by FirstEnergy.[23]

66.     In that regard, on or about March 15, 2018—two weeks before FirstEnergy

subsidiaries filed for bankruptcy protection and FirstEnergy requested emergency action from

the DOE—the Company wired $300,000 from Partners for Progress to Generation Now for

Householder's benefit."[24]  Four days earlier, Jones met with Householder to "[d]iscuss Speaker

race and votes needed."[25]  Additionally, FirstEnergy executives wired $100,000 from Partners

for Progress to Generation Now on or about May 4, 2018, four days before the Ohio primary

election.[26]  FirstEnergy also sent approximately $400,000 for Householder's benefit, and at his

request, through another 501(c)(4) entity in late April 2018, which through a series of

transactions ultimately paid approximately $400,000 for media benefiting Householder before

the primary.[27]

---

[21] *Id.*

[22] *Id.*

[23] *Id.* at 22.

[24] *Id.*

[25] *Id.* (alteration in original).

[26] *Id.*

[27] *Id.*

23

67.     FirstEnergy has admitted to numerous additional facts detailing precisely how the pay-to-play scheme was effectuated.  For example:

> On August 5, 2018, [Jones] asked [Dowling], "[Is] [Householder] looking for more money?" to which [Dowling] responded, "You know the answer to the [Householder] question, but I don't know for how much he'll ask.  I'll get a list from [Ohio Director of State Affairs] as to the House races he's most interested in winning and I'll have something for you as to what fepac is doing in those races.  He'll want hard money first and then C(4) money for sure.  I'll be back to you today."  Later that day, [Dowling] followed up and said, "[Householder] wants to hear about us—status of company, what's important to us this year and next year.  Money will come up—help with key races and C(4)."  Following a meeting involving [Jones] and [Householder], on or about August 16, 2018, FirstEnergy Corp. wired $500,000 from Partners for Progress to Generation Now for [Householder]'s benefit.

68.     Additionally, in October 2018 FES paid Generation Now another $500,000 for Householder's benefit, $400,000 of which was hand-delivered to Householder during an in-person meeting on or about October 10, 2018.[28]  Just about a week earlier, on October 2, 2018, Dowling told Jones, "I know you know this, but this is where companies and people get in political trouble—everyone is in a rush and they all need a ton of hel$p.  Let me gather everything.  I'll bring it to you and you/we can decide."[29]  Then, on October 10, 2018, the day of the Householder meeting, Jones and Dowling discussed the meeting by text:

> Jones:  "FES meeting with [Householder] today.  I told him to be nice but listen to us."
>
> Dowling:  "He'll learn about the $400k at this mtg."
>
> Jones:  "They better get it done quick or he won't be able to spend it."[30]

---

[28] *Id.* at 23.

[29] *Id.* at 23-24.

[30] *Id.* at 24.

After the meeting, Householder texted Jones regarding the money from FES, stating "$400k… thank you."[31]

69. Further, following the October 23, 2018 meeting, FirstEnergy, through Jones and Dowling, persuaded other companies to send payments to a dark-money entity to support Householder.[32]

70. As FirstEnergy has admitted, "[the Company]'s plan to fund [Householder]-approved House races through payments to Generation Now to help get [Householder] elected Speaker in return for introducing nuclear legislation was successful," as on January 7, 2019 the Ohio House of Representatives elected Householder as Speaker.[33]

**B. Defendants Concealed from Investors the Illegal Conduct Relating to the Passage of HB 6 and the Defeat of the Ensuing Ballot Initiative to Undue the Legislation.**

**1. Defendants made false or misleading representations to investors specifically regarding HB 6.**

71. Following HB 6's passage, Defendants made statements to investors regarding the legislation and its impact on FirstEnergy, including the benefits of the law's "decoupling" provision.

72. In this context, "decoupling" means separating an energy company's recovery of fixed costs from its sales. As the National Conference of State Legislatures explained in a 2019 report, while energy efficiency "delivers several benefits including, reducing pollution, saving households and businesses money on energy bills, improving health and comfort, increasing electric grid resilience, creating jobs and expanding economic development," efficiency "faces

---

[31] *Id.*

[32] *Id.* at 24-25.

[33] *Id.* at 25.

market and other barriers," including regulatory obstacles.[34] Under many utility business models, "greater profits are linked to selling more energy and making more capital investments—objectives that conflict with energy efficiency, which seeks to reduce energy usage and waste."[35] One way to address this disconnect is through decoupling, which "breaks the link between electricity sales and profits while allowing utilities to collect approximately the same revenue as they would under traditional regulation."[36] Decoupling mechanisms "allow rates to be adjusted up or down as a utility's actual energy sales fluctuate above or below the amount needed to cover their revenue requirement," which is determined "by calculating a utility's expected reasonable operating expenses and adding a fair rate of return."[37]

73. In a Form 8-K filed on July 23, 2019, FirstEnergy touted HB 6's passage, stating "[w]e believe this bill is good for customers" and representing that the bill "[c]ontributes to Ohio's economic success and the security and resiliency of the regional electric grid while mitigating the potential impact of uncertain electric markets on our customers' electric bills," and "[i]ncludes provisions that allow electric utilities to implement a decoupling mechanism."

74. In its Form 10-Q for the second quarter of 2019, also filed on July 23, 2019, FirstEnergy highlighted that "[i]n addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities." The Company also noted the legislation "is ending current energy efficiency program

---

[34] Megan Cleveland, Logan Dunning, and Jesse Heibel, "State Policies for Utility Investment in Energy Efficiency," National Conference of State Legislatures (Apr. 2019).

[35] *Id.*

[36] *Id.*

[37] *Id.*

mandates on December 31, 2020, provided statewide energy efficiency mandates are achieved as determined by the PUCO." The Company added:

> Should the Ohio Companies elect to apply to the PUCO for approval of the decoupling mechanism, it would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. FirstEnergy is reviewing the potential impacts to customers and the Ohio Companies, and may seek approval for this mechanism later this year.[38]

75. Further, during an earnings call on July 24, 2019, Jones commented with respect to HB 6, "how great it is in the State of Ohio to have leadership in Columbus, who actually looks at issues and is willing to lead." Jones "complement[ed]" Householder, PUCO Chairman Randazzo, and others for their work on the bill "[w]ith a goal I think of providing stable and transparent rates for customers going forward and keeping their Ohio utilities strong at the same time." Jones added, "And I think they came up with an approach that was very strong in terms of looking out for this industry and our customers in the State of Ohio."

76. In a press release issued the same day, FirstEnergy stated, among other things, it was "thankful for the support and commitment by Speaker Householder and Senate President [Larry] Obhof who understood the importance of protecting 90% of the state's zero-emissions electricity, substantial employment and the need to provide affordable rates from a diverse portfolio of generation sources for Ohioans."

77. Also in a July 24, 2019 press release, Defendant John Judge, on behalf of Energy Harbor, touted HB 6's enactment as "a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio while preserving 4,300 highly-skilled jobs

---

[38] The Form 10-Q defines "Ohio Companies" as consisting of the following current or former subsidiaries of FirstEnergy: The Cleveland Electric Illuminating Company, Ohio Edison Company, and The Toledo Edison Company.

and an important economic engine for the state economy." He also commended the Ohio

legislature for "drafting a bill that preserves the state's nuclear assets, reduces the customers'

electric bills and provides rigorous oversight to protect customers if market conditions change,"

and stated "[w]e're also thankful for the support and commitment by Speaker Householder."

78.     On the same day, *PR Newswire* distributed an article titled "FirstEnergy Solutions

Applauds Enactment of HB6 Legislation," in which Judge was quoted as stating, in pertinent

part:

> We are very pleased that Governor Mike DeWine signed HB6 following its
> successful bi-partisan passage in the General Assembly. . . . We're also thankful
> for the support and commitment by Speaker Householder and Senate President
> Obhof who understood the importance of protecting 90% of the state's zero-
> emissions electricity, substantial employment and the need to provide affordable
> rates from a diverse portfolio of generation sources for Ohioans.

79.     As detailed in the below chart, Defendants made additional statements regarding

HB 6 and related issues, including an initiative by opponents of the legislation to submit it to a

statewide referendum on the November 2020 ballot:

| Date | Source | Statement |
|------|--------|-----------|
| 7/28/2019 | *The Columbus Dispatch* Article quoting FirstEnergy Spokesperson | "FirstEnergy Corp. makes and discloses all campaign contributions in accordance with applicable state and federal laws." |
| 11/4/2019 | FirstEnergy Form 10-Q | "On July 23, 2019, Ohio enacted legislation establishing support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities. The legislation also is ending current energy efficiency program mandates on December 31, 2020, provided statewide energy efficiency mandates are achieved as determined by the PUCO. On October 23, 2019, the PUCO solicited comments on whether the PUCO should terminate the energy efficiency programs once the statewide energy efficiency mandates are achieved. The Ohio Companies plan to apply to the PUCO for approval of the |

| | | decoupling mechanism later this year, which would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. Opponents to the legislation are petitioning to submit the legislation to a statewide referendum on the November 2020 ballot, and stay its effect unless and until approved by a majority of Ohio voters. On September 4, 2019, a lawsuit was filed with the SCOH [i.e., Supreme Court of Ohio], challenging the referendum on the grounds that the provisions supporting nuclear energy are a new tax and taxes cannot be overturned by referendum. On October 7, 2019, petitioners filed a lawsuit in the U.S. District Court for the Southern District of Ohio challenging various Ohio legal requirements for a referendum, and seeking additional time to gather signatures in support of a referendum. Petitioners did not meet the October 21, 2019 deadline to file the necessary number of petition signatures. On October 23, 2019, legislation went into effect. The U.S. District Court denied petitioners' request for more time, and certified questions of state law to the SCOH to answer." |
|---|---|---|
| 11/4/2019 | Defendant Jones during FirstEnergy Earnings Call | "We expect to file the decoupling rates and the commission has 60 days to approve them. . . . As far as how I look at it, I think it establishes a fixed cost for the base distribution costs in Ohio. . . . [I]t takes about 1/3 of our company and I think [it] makes it somewhat recession-proof." |
| 2/10/2020 | FirstEnergy Form 10-K | "On July 23, 2019, Ohio enacted legislation establishing support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities. The legislation also is ending current energy efficiency program mandates on December 31, 2020, provided statewide energy efficiency mandates are achieved as determined by the PUCO. On October 23, 2019, the PUCO solicited comments on whether the PUCO should terminate the energy efficiency programs once the statewide energy efficiency mandates are achieved. Opponents to the legislation sought to submit it to a statewide referendum, and stay its effect unless and until approved by a majority of Ohio voters. Petitioners filed a lawsuit in the U.S. District Court for the Southern District of Ohio seeking additional time to gather signatures in support of a referendum. Petitioners failed to file the necessary number of petition |

| | | |
|---|---|---|
| | | signatures, and the legislation took effect on October 22, 2019. On October 23, 2019, the U.S. District Court denied petitioners' request for more time, and certified questions of state law to the SCOH to answer. Petitioners appealed the U.S. District Court's decision to the U.S. Court of Appeals for the Sixth Circuit. The Petitioners ended their challenge to the legislation voluntarily at the end of January 2020 causing the dismissal of the appeal, the lawsuit before the U.S District Court, and the proceedings before the SCOH." |
| 3/5/2020 | FirstEnergy Spokesman Mark Durbin quoted in *Energy News Network* Article | "FirstEnergy Corp. makes and discloses all campaign contributions in accordance with applicable state and federal laws. . . . In the meantime, FirstEnergy continues to focus on transforming into a fully regulated utility that is making investments that will strengthen the electric system, boost reliability for customers and prepare the grid for smart technologies." |
| 4/23/2020 | FirstEnergy Form 10-Q | "On July 23, 2019, Ohio enacted legislation establishing support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities and ending current energy efficiency program mandates on December 31, 2020, provided that statewide energy efficiency mandates are achieved as determined by the PUCO. On February 26, 2020, the PUCO ordered (i) that a wind-down of statutorily required energy efficiency programs shall commence on September 30, 2020, and the programs shall terminate on December 31, 2020, and (ii) that the Ohio Companies' existing portfolio plans are extended through 2020 without changes." |
| April 24, 2020 | Defendant Strah on Earnings Call | "I'd like to reiterate FirstEnergy's overall value proposition, which is very simple, but also very unique, especially in periods of extreme volatility and uncertainty like we're facing today. FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility that spans 5 states. . . . We have very good regulatory relationships in our jurisdictions." |

> **2.** **Defendants' representations were false or misleading, in light of Defendants' misconduct during 2017 and 2018 as well as their bribery and money laundering in connection with HB 6's passage and the ensuing referendum initiative.**

80. The statements in section IV.B.1 above were false or misleading when made, given the facts detailed in section IV.A.2 above as well as the facts detailed below regarding Defendants' illegal conduct in connection with HB 6's passage and the events following it.

81. Following Householder's election as Ohio House Speaker in January 2019, FirstEnergy executives and representatives worked directly with him in drafting the nuclear legislation leading up to HB 6's introduction in the House.[39] Specifically, from the time of HB 6's introduction in April 2019 until October 2019, FirstEnergy worked directly with FES to support Householder through payments to Generation Now "with the intent and for the purpose that, in return, [Householder] would take specific official action relating to the passage of House Bill 6 and the defeat of the ballot referendum initiative to overturn House Bill 6."[40] FirstEnergy paid the money to Householder through Generation Now "intending to influence and reward [Householder] in connection with passage of House Bill 6 and defeating the ballot referendum."[41]

82. During that time, FES paid over $40 million through wire transfers to Generation Now for Householder's benefit—while FES was involved in bankruptcy proceedings—and FirstEnergy paid over $13 million through wire transfers from Partners for Progress to Generation Now.[42] FirstEnergy has admitted certain of its executives "knew that the money paid

---

[39] DPA SOF at 26.

[40] *Id.*

[41] *Id.*

[42] *Id.*

to Generation Now was controlled by [Householder] and was for [Householder]'s benefit to use as he directed."[43]

83.    Householder and his team directed how much money to pay into Generation Now to further their efforts to pass HB 6 and defeat the ensuing ballot referendum that threatened to undo the legislation.[44]  The strategy included an advertising campaign whose purpose "was to provide legislators with the necessary cover to support House Bill 6."[45]

84.    FirstEnergy has admitted that the specific "official action" by Householder relating to HB 6's passage "included helping draft the nuclear bailout legislation at FirstEnergy Corp.'s and FES's direction and pressuring and advising other public officials to take official action to support the nuclear legislation."[46]  Specifically, while the bill was pending, FirstEnergy sought official action from Householder in the form of pressuring and advising other officials to support a decoupling provision that the Company supported, as well as an extension of the term of nuclear subsidies to ten years.

85.    As FirstEnergy has admitted, the decoupling provision in HB 6 "allowed FirstEnergy Corp.'s Ohio electric distribution subsidiaries to receive a fixed amount of distribution-related revenue from residential and commercial customers based on the 2018 collection period, which was a year of high electricity sales for FirstEnergy Corp."[47] Additionally, that provision "allowed FirstEnergy Corp. to continue to recover lost distribution revenue ('LDR') in a fixed amount based on its 2018 LDR recovery, despite the elimination of

---

[43] *Id.* at 27.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 28.

[47] *Id.* at 18.

energy efficiency programs in House Bill 6."[48] Decoupling "therefore would guarantee FirstEnergy Corp.'s Ohio electric distribution subsidiaries a fixed amount of revenue by tying its distribution revenue to the 2018 level and continued collection of LDR."[49]

86.     To that end, on April 15, 2019—three days after Householder introduced HB 6—Dowling wrote an e-mail to Jones and several other FirstEnergy executives and employees regarding "talking points" for "educating legislators" with respect to the "decoupling language which we proposed be included in the recently-introduced Ohio Clean Energy Bill (House Bill 6)."[50] In the same e-mail chain, Dowling "made clear that the decoupling language in House Bill 6 was the result of coordination with the Speaker's office."[51]

87.     Over the following months, Jones, Dowling, and at least one FES executive[52] coordinated with Householder to ensure the decoupling provision and an extension of nuclear subsidies for 10 years were included in HB 6.[53]

88.     Their efforts succeeded, as HB 6 was signed into law—with the decoupling provision included—on July 23, 2019. That day, Dowling texted Jones a screenshot showing HB 6 passing by a 51-38 vote, which was followed by the following exchange:

   [Dowling]:  Boom! Congrats. This doesn't happen without ceo leadership.

   [Dowling]:  [Image of House vote]

---

[48] *Id.*

[49] *Id.*

[50] *Id.* at 28.

[51] *Id.*

[52] The DPA identifies this individual as "FES Executive A" but does not provide sufficient information to identify the executive. Plaintiffs believe the documents quoted in the DPA would identify this individual because the DPA used brackets to insert the anonymous title "FES Executive A" in place of the individual's name.

[53] DPA SOF at 29-30.

[Jones]:  We made a bbiiiiiiiig bet and it paid off. Actually, 2 big bets. Congrats to you and the entire team! See if [name] has any Pappy and we'll all head to Columbus tonight.

[Dowling]:  Huge bet and we played it all right on the budget and HB 6—so we can go back for more!

[Dowling]:  No party tonight. We are going to plan one with the Speaker later.

[Dowling]:  You should call the Speaker today.

[Jones]:  Already texted him…[54]

89.    Following HB 6's enactment, FirstEnergy and FES "agreed to pay millions of dollars to [Householder] through payments to Generation Now in return for and in connection with [Householder]'s efforts to defeat the ballot referendum" aimed at undoing the legislation.[55] The specific official action those payments bought included Householder's efforts to have HB 6 interpreted as a "tax," which under law could not be challenged through a ballot referendum; and, if the ballot initiative obtained enough signatures to put the referendum of HB 6 on the ballot, to advance alternate legislation to include making clear that HB 6 was a tax.[56]

90.    FirstEnergy has admitted that to further its scheme with respect to the ballot initiative, the Company "used Partners for Progress . . . to conceal payments to [Householder]."[57] Specifically, in October 2019 FirstEnergy paid a total of $13 million to Generation Now for Householder's benefit by first wiring the money through Partners for Progress rather than paying it to Generation Now directly.[58]  FirstEnergy has admitted it paid that money "at [Householder's

---

[54] *Id.* at 30 (third and fifth alterations in original).

[55] *Id.*

[56] *Id.* at 30-31.

[57] *Id.* at 31-32.

[58] *Id.* at 32.

and FES's request, knowing and with the intent that the money was in return for [Householder]'s efforts to defeat the ballot referendum and ensure House Bill 6 became law."[59]

91.     The attempted ballot referendum to repeal HB 6 stalled on October 21, 2019 due to a failure to obtain enough signatures.

>       **3.      Defendants' illegal conduct with respect to PUCO Chairman Samuel Randazzo also rendered their representations to investors false or misleading.**

92.     FirstEnergy's bribery and money laundering scheme was not limited to Householder or the Ohio legislature; it also targeted the leadership of PUCO, the regulator with direct oversight of the Company's failing nuclear plants in Ohio.  FirstEnergy has admitted it made payments to PUCO's Chairman Samuel Randazzo in exchange for official actions to assist FirstEnergy.

93.     Before December 2018, FirstEnergy made payments to Randazzo under agreements with him through his consulting company.[60]

94.     FirstEnergy claims a 2013 consulting agreement was amended in 2015, although it admits this amendment was never actually signed.  The Company further admits the unsigned amendment "coincided with and was made in exchange for [Randazzo]'s industrial group withdrawing its opposition to a 2014 PUCO Electric Security Plan settlement package involving FirstEnergy Corp.'s Ohio electric distribution subsidiaries."[61]  The unsigned amended agreement contemplated an increase in Randazzo's retainer and supplemental payments through 2024.

---

[59] *Id.*

[60] DPA SOF at 34.

[61] *Id.* at 35.

FirstEnergy has admitted "[i]nvoices from Company 1 were structured to bypass FirstEnergy

Corp.'s Level of Signature Authority levels for purposes of internal approval of the payments."[62]

95.     In January 2019, Randazzo received a payment of $4,333,333, representing the

remaining payment amounts designated in the amended consulting agreement from 2019 through

2024, even though FirstEnergy was not legally obligated to make the payment at that time.[63]

FirstEnergy has admitted it made that payment "with the intent and for the purpose that, in

return, [Randazzo] would perform official action in his capacity as PUCO Chairman to further

FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific

FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose."[64]

96.     Randazzo, Jones, and Dowling discussed the payment in December 2018.  On

December 17, 2018, Randazzo e-mailed Dowling and others the announcement stating PUCO

was seeking applications for a commissioner.[65]  The next day, Jones and Dowling met with

Randazzo at his condominium, during which they discussed the remaining payments under the

consulting agreement as well as Randazzo's candidacy for the open PUCO chair position.[66]

97.     The following day, December 19, 2018, Randazzo texted Jones and Dowling,

detailing the remaining payments under the consulting agreement from 2019 to 2024, which

totaled $4,333,333.[67]  Later that day, Jones texted Randazzo and Dowling, stating: "We're gonna

get this handled this year, paid in full, no discount. Don't forget about us or Hurricane [Jones]

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.* at 35-36.

may show up on your doorstep! Of course, no guarantee he won't show up anyway." Jones then attached an image of a venomous snake protruding from a hurricane.[68] Randazzo replied: "Made me laugh—you guys are welcome anytime and any whereI [sic] can open the door. Let me know how you want me to structure the invoices. Thanks."[69] He then added, "I think I said this last night but just in case—if asked by the administration to go for the Chair spot, I would say yes."[70]

98.     FirstEnergy has admitted that after meeting with Randazzo in December 2018, "certain FirstEnergy Corp. executives pushed to have [Randazzo] appointed as the PUCO Chairman," and those efforts "included working directly to advance the appointment of [Randazzo] as PUCO Chairman so that [Randazzo] could further FirstEnergy Corp.'s interests in that role through official action."[71]

99.     On January 2, 2019, FirstEnergy Service wired the $4,333,333 to Randazzo's company bank account, and the same day Dowling stated to Jones in a text:

> [Jones] - this text came to me this morning from [Randazzo].  His mtg with Gov.-elect is this Friday and I suspect, absent any problem, things will go down as we've discussed, with [Individual E] getting [PUCO Official 1]'s seat as soon as [PUCO Official 1] leaves.  In any event, pls see [Randazzo]'s mssg re: meeting with us soon in Akron.
>
> [Dowling], I would like to come to Akron on 1/10, 1 /11, 1/14 or 1/15 to get a better understanding of the "hole" (size, shape, life expectancy and so on).  Also, I would like to discuss a couple concepts that I landed on after our recent meeting.  If [Jones] is available to discuss concepts, that would be a plus.  If none of the above days work, get me a couple that do, please.[72]

---

[68] *Id.* at 36.

[69] *Id.* (alteration in original).

[70] *Id.*

[71] *Id.*

[72] *Id.* at 37 (third, fourth, and fifth alterations in original).

100.     Jones responded with a date and time for meeting Randazzo, and later that day Dowling and Jones further discussed their upcoming meeting with him:

> Dowling:  Is there anyone internally you'd like to include?  I'll ask him about his location preference.  My guess is that he's on point to figure out what we need and to report back as to how it should be/could be fixed.
>
> Jones:     I think just you and me.  Don't want too many on the inside right now. That's probably his preference also.

Dowling then forwarded a text from Randazzo: "From [Randazzo].  Probably best if it is you and [Jones].  If more is required, I can follow up.  I don't think that we will get into the weeds.  That can come once we get comfortable with a conceptual framework."[73]

101.     On January 14, 2019, Dowling texted Jones regarding, among other things, the "Ohio hole" and "extending our ESP" (i.e., Electric Security Plan), as well as the timing of what would ultimately become HB 6: "[Randazzo] was talking about the number of weeks needed for him to coalesce parties on the broad construct of an energy bill.  Before introduction."[74] According to Dowling, Randazzo estimated "the 6 to 8 week time frame to pull together (not necessarily pass) the legislative component assumes that the new administration makes the appointment ASAP and runs from the date of the appointment."[75]

102.     On January 28, 2019, while FirstEnergy executives were lobbying to have Randazzo appointed as PUCO Chairman, Dowling texted Jones regarding a solution to the Ohio "hole" and an update on Randazzo's nomination: "[Jones]—[Individual G] and I just finished a good meeting with [Randazzo] on the way to solve the 2024 issue.  No one internal knows we

---

[73] *Id.*

[74] *Id.* at 37-38.

[75] *Id.* at 38.

met with him."[76]  Jones responded, "Any word on his status?" and Dowling's reply indicates he

spoke with a state official and "no decision but that he had a great conversation with Gov this

morning."[77]

103.     The plan to have Randazzo appointed as PUCO Chairman succeeded: on

February 4, 2019, his selection was announced.[78]  The next day, Jones texted Randazzo to

congratulate him, and Randazzo responded, "Thanks, [Jones]—the last four days have been

tuff," further stating, "Thanks goes to some great good friends."[79]

104.     Following his selection, Randazzo immediately worked to further FirstEnergy's

interests.  On or about February 13, 2019, Dowling told Randazzo that Jones was meeting with

Householder that day, and asked, "Anything you think [Jones] should raise?"[80]  Randazzo

responded: "We need coordination between executive and legislative branches to get sensible

stuff over the goal line.  Absent that, the current polarization will pull everything under."[81]

105.     FirstEnergy has admitted that in his capacity as PUCO Chairman, Randazzo

"performed official action, including acts related to House Bill 6 and the elimination of

FirstEnergy Corp.'s requirement to file a new base rate case in 2024," which "further[ed]

FirstEnergy Corp.'s specific legislative and regulatory interests at the direction of and in

---

[76] *Id.*

[77] *Id.*

[78] *Id.* at 39.

[79] *Id.*

[80] *Id.*

[81] *Id.*

coordination with certain FirstEnergy Corp. executives, as FirstEnergy Corp. requested and as opportunities arose."[82]

106.    Among other things, FirstEnergy coordinated with Randazzo with respect to incorporating a decoupling provision into HB 6, which (as noted above) would greatly benefit the Company by preserving its ability to maintain electricity rates at favorable 2018 levels. In that regard, on June 28, 2019, Dowling stated in a text to Jones: "Just heard from [Randazzo].. [sic] decoupling looks good."[83]

107.    Additionally, on July 16, 2019, Dowling and Jones exchanged texts regarding the status of HB 6 and the budget:

> [Dowling]:  Budget conferees are meeting now - so the budget looks to be good to go (or they wouldn't be meeting).  Our SEET language  is in the bill.  Still awaiting word on HB6 but our intel is that [Official Aide 1], [State Official 2] and [Randazzo] are still trying to get [FES] some more years."
>
> [Jones]:  Decoupling?
>
> [Dowling]:  Will be offered tomorrow by [Senator 5] with help from [Senator 6]. Stupid they're making her offer it, but we are convinced there's no monkey business.  It's greased.[84]

108.    As noted earlier, on July 23, 2019, HB 6 passed the legislature with the decoupling provision included.  That day, Jones sent Randazzo a photo-shopped image of Mount Rushmore with the face of Randazzo alongside Dowling and others imposed over the four faces of presidents, with the caption, "HB 6 F[---] ANYBODY WHO AINT US."[85]

---

[82] *Id.* at 40.

[83] *Id.* (second alteration in original).

[84] *Id.* at 40-41 (second, third, eighth, and ninth alterations in original).

[85] *Id.* at 41.

109.    FirstEnergy has further admitted that additionally, at the Company's "request and direction," Randazzo "performed official action to fix FirstEnergy Corp.'s 'Ohio hole' through a PUCO opinion eliminating the requirement that FirstEnergy Corp.'s Ohio electric distribution subsidiaries file a new base rate case when ESP IV ended in 2024."[86]

110.    On November 10, 2019, for example, Jones texted "Company C Executive," noting the significance of the base rate case issue to investors: "And, the FE rescue project is not over.  At EEI financial conference.  Stock is gonna get hit with Ohio 2024.  Need [Randazzo] to get rid of the 'Ohio 2024' hole."[87]

111.    On November 15, 2019, Dowling stated in a text to Jones: "I spoke with [Randazzo] today.  Told me 2024 issue will be handled next Thursday (November 21)."[88] Dowling later texted that "[Randazzo]'s going to make the requirement to file go away, but I do not know specifically how he plans to do it."[89]

112.    On November 21, 2019, Dowling texted to Jones, "Today is our day for action on the 2024 issue," and Jones suggested that Randazzo make a "public statement" about the ruling, to which Dowling replied, "On it."[90]  Later that day, PUCO issued a ruling that FirstEnergy's Ohio electric distribution subsidiaries were no longer required to file a new rate distribution case in 2024.[91]

---

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.* at 41-42.

[90] *Id.* at 42.

[91] *Id.*

113.    The PUCO ruling was significant to FirstEnergy.  Under HB 6, part of the

Company's revenue would have been decoupled at least until the Company's next base

distribution rate case scheduled for 2024.  As PUCO's ruling eliminated FirstEnergy's Ohio

subsidiaries' requirement to file a new rate distribution case in 2024, the ruling "addressed the

2024 'Ohio hole'" by extending the time before those subsidiaries needed to file a base rate

case.[92]

114.    The following day, Jones sent Randazzo a text showing FirstEnergy's stock price

increase, with a note saying "Thank you!!"[93]

### C.    Defendants Made False or Misleading Statements to Investors Regarding FirstEnergy's Purported Controls for Political Spending and 501(c)(4) Entities.

115.    Throughout the Relevant Period, Defendants also made numerous representations

to investors regarding (1) the transparency, integrity, and legality of FirstEnergy's political

spending; (2) Defendants' efforts to ensure that FirstEnergy's political spending complied with

applicable laws; and (3) the legality of Defendants' use of 501(c)(4) entities.

116.    For example, during the Relevant Period FirstEnergy maintained an "investor

relations" webpage that included the following reassurances with respect to FirstEnergy's

purported "Corporate Political Activity Policy":[94]

> FirstEnergy believes it has a responsibility to its shareholders, customers
> and employees to participate in the political process and, ***where***
> ***appropriate and legally permissible, to make contributions in***

---

[92] *Id.*

[93] *Id.*

[94] On information and belief, from the beginning of the Relevant Period until on or about
May 12, 2020, this policy statement was available at:
https://www.firstenergycorp.com/investor/corporate_governance/policies_charters/corporate_pol
itical_activity_policy.html.  By May 12, 2020, the policy statement had been moved to:
https://firstenergycorp.com/investor/corporate_governance/responsibility/corporate_political_act
ivity_policy.html.  The terms on the two policy statements are substantially the same.

*connection with elections for public office and expenditures in connection with non-candidate state and local ballot initiatives such as referendums and constitutional amendments*.

*FirstEnergy has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy*.  Accordingly, this policy describes the criteria for certain political contributions and ballot initiative expenditures made with corporate funds and the process for approving such contributions and expenditures. . . .

*In certain circumstances, where permitted by law, and with the approval of our External Affairs Department, FirstEnergy may use corporate funds for the payment of dues and/or contributions* to section 527 organizations (tax exempt organizations that engage in political activities), *section 501(c)(4) organizations* and trade associations *that may use a portion of such dues for political and lobbying activities*. . . .

*Any request for a FirstEnergy political contribution and grassroots lobbying communications, including contributions to an entity operating under Section 527 of the Internal Revenue Code or an expenditure for a non-candidate state and local ballot initiative, shall be submitted to the External Affairs Department for review and approval. The External Affairs Department will review the request to confirm that the proposed contribution or expenditure is in the best interests of FirstEnergy and, working with the FirstEnergy Legal Department, confirm that any contribution or expenditure we consider complies with applicable election laws, rules and regulations.*

The External Affairs Department will keep accurate records of any corporate political contributions and take actions to ensure that where required, complete and accurate disclosures to government entities are made.

117.    Further, FirstEnergy's March 3, 2017 Preliminary Proxy Statement and March 31, 2017 Definitive Proxy Statement (collectively, the "2017 Proxy Statements") filed in connection with a May 16, 2017 shareholder meeting cited the Corporate Political Activity Policy as a reason for voting against a shareholder proposal requesting an annual report on the Company's lobbying policies and payments:

Your Company believes that it has a responsibility to participate in the legislative, regulatory and political process.  Sharing its views and

43

educating officeholders, regulators, community and business leaders, and the public on key issues helps your Company promote effective government and the interests of key stakeholder groups including our shareholders, employees and the communities we serve. ***By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust. . . .***

The Political Activity Policy addresses your Company's participation in the political process and political contributions and lobbying expenses. . . .

***Your Company complies with all federal and state lobbying registration and disclosure requirements***, which include filing all required reports with the U.S. Congress and applicable state agencies. . . .

***Your Company is committed to providing appropriate information and disclosures to its investors concerning its lobbying activities.*** Additionally, ***your Company believes that its current procedures and policies promote transparency and compliance with law*** and addresses the concerns identified in the proposal. Preparation of reports beyond what is already produced would be a duplicative and onerous task that would divert important resources from alternative efforts that your Company's Board and management deem to be in the best interests of your Company and its shareholders.

118. Following the defeat of the shareholder proposal concerning lobbying activities referenced above, FirstEnergy made additional false or misleading statements about its controls regarding political contributions. Specifically, according to FirstEnergy's March 30, 2018 Proxy Statement:

Enhanced Board Oversight of Lobbying Activities and Related Disclosures: Although it did not pass, in response to the vote received on the 2017 lobbying activities shareholder proposal, we elicited shareholder feedback on the Company's current practices and disclosures concerning our lobbying activities. Most of those engaged shareholders indicated little or no concern with our current disclosures; however, some investors suggested that we include more specific information about the Corporate Governance Committee's oversight role of our lobbying activities. Accordingly, in 2017, ***your Board further strengthened its oversight of your Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility. The Corporate Governance Committee maintains***

> ***an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations. We also regularly evaluate our related disclosures and anticipate updating these disclosures on our website*** . . . .

> The Corporate Governance Committee's charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations.

119. FirstEnergy's April 1, 2019 and April 1, 2020 Proxy Statements continued to stress the strength of its Corporate Political Activity Policy:

> We have a decision-making and oversight processes in place for political contributions and expenditures. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. Also, your Board's Corporate Governance, Sustainability and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.

120. FirstEnergy's reassuring statements regarding its purported "Corporate Political Activity Policy" were false or misleading because they conveyed to investors that the Company was taking reasonable steps to "confirm that any contribution or expenditure we consider complies with applicable election laws, rules and regulations" and that any contributions "were appropriate and legally permissible" and "in the best interests of FirstEnergy," when, in fact, FirstEnergy's CEO (Jones) and Senior Vice President in charge of the compliance review (Dowling) were actively causing FirstEnergy and its affiliates to bribe Householder and Randazzo in exchange for favorable legislation and regulatory actions by PUCO.

121. Indeed, in addition to the numerous damning facts FirstEnergy has admitted about the bribery and money laundering scheme detailed in Sections IV.A.2 and IV.B.2-3 above, the Company admitted in an amended Form 10-K filed on November 19, 2020 that its internal

controls were deficient due to senior management's failure "to set an appropriate tone at the top,"

resulting in "inappropriate conduct":

> We did not maintain an effective control environment as our senior
> management failed to set an appropriate tone at the top. Specifically,
> certain members of senior management failed to reinforce the need for
> compliance with the Company's policies and code of conduct, which
> resulted in inappropriate conduct that was inconsistent with the
> Company's policies and code of conduct.

> [T]his control deficiency could have resulted in material misstatements
> to the annual or interim consolidated financial statements that would not
> have been prevented or detected. Accordingly, our management has
> concluded that this control deficiency constitutes a material weakness.

### D.  Defendants Made False or Misleading Statements to Investors Regarding the Legal Risks Associated with FirstEnergy's Lobbying Activities.

122.   Through FirstEnergy's annual and quarterly SEC filings, Defendants consistently

misled investors about the serious legal risks of the Company's unlawful conduct in connection

with so-called "lobbying."

123.   FirstEnergy's 2016 Form 10-K, filed on February 21, 2017, featured 20 pages of

"Risk Factors" on a variety of subjects that purportedly addressed the most significant risks

facing the Company, including: (1) "Risks Related to the Transition to a Fully Regulated

Utility"; (2) risks related to FES, including the FES bankruptcy proceedings; (3) risks related to

the "deactivation of one or more of the nuclear generating units"; (4) the risk that a "Failure to

Provide Safe and Reliable Service and Equipment Could Result in Serious Injury or Loss of Life

That May Harm Our Business Reputation and Adversely Affect our Operating Results"; (5) risks

from "Temperature Variations as well as Weather Conditions or other Natural Disasters"; (6) the

risk that "Cyber-Attacks, Data Security Breaches and Other Disruptions to Our Information

Technology Systems Could Compromise Our Business Operations, Critical and Proprietary

Information and Employee and Customer Data, Which Could Have a Material Adverse Effect on

Our Business, Financial Condition and Reputation"; (7) risks related to "Physical Acts of War,

Terrorism or Other Attacks on any of Our Facilities or Other Infrastructure"; (8) "Risks

Associated With Regulation," including with respect to PUCO; and (9) "Risks Associated with

Climate Change."  The Company included substantially similar representations regarding many

of the same "Risk Factors" in its Form 10-Ks for 2017, 2018, and 2019.

124.    But none of those SEC filings stated, or even indicated, to investors that

FirstEnergy was subject to enormous risks of governmental, regulatory, civil, and even criminal

sanctions and liability based on the bribery and money laundering scheme detailed in Sections

IV.A.2 and IV.B.2-3 above.

> **E.    Defendants Made False or Misleading Statements to Investors Regarding FirstEnergy's Internal Controls and Corporate Governance.**

125.    Defendants also falsely or misleadingly assured investors, on numerous occasions

during the Relevant Period, that FirstEnergy had effective internal controls and that the

Company's senior executives had determined there was no fraud.

126.    For example, FirstEnergy stated in its 2016 Form 10-K that (1) "[t]he respective

management of FirstEnergy and FES, with the participation of each respective registrant's chief

executive officer and chief financial officer," had "reviewed and evaluated" the effectiveness of

their respective entity's disclosure controls and procedures, as defined in the Exchange Act, as of

the end of 2016; and (2) based on that evaluation, the CEO and CFO of FirstEnergy and FES,

respectively, "concluded that each respective registrant's disclosure controls and procedures

were effective as of the end of [2016]."

127.    The Company reiterated these assurances in another section of the Form 10-K:

> Management is responsible for establishing and maintaining adequate internal
> control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of
> the Securities Exchange Act of 1934. Using the criteria set forth by the
> Committee of Sponsoring Organizations of the Treadway Commission in

*Internal Control – Integrated Framework* published in 2013, the respective management of each registrant conducted an evaluation of the effectiveness of their registrant's internal control over financial reporting under the supervision of each respective registrant's Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the respective management of each registrant concluded that their registrant's internal control over financial reporting was effective as of December 31, 2016.

128. Substantially similar representations regarding FirstEnergy's and/or FES's internal controls appear in FirstEnergy's Form 10-Ks for 2017, 2018, and 2019. Additionally, in numerous Form 10-Qs filed in 2017, 2018, 2019, and 2020, FirstEnergy represented "there were no changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, [FirstEnergy]'s and FES' internal control over financial reporting."

129. Each of those representations was false or misleading when made, given the striking—and largely admitted—facts regarding the ongoing bribery and money laundering scheme in which FirstEnergy's senior executives engaged throughout the Relevant Period.

130. FirstEnergy also stated in the 2017 Proxy Statements that it was committed to "good corporate governance," which the Company "believe[d] is important to the success of our business and in advancing shareholder interests," and emphasized "integrity" and "trust." The Company further highlighted "transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation, both directly and indirectly."

131. FirstEnergy similarly represented in its March 2, 2018 Preliminary Proxy Statement and March 30, 2018 Definitive Proxy Statement (collectively, the "2018 Proxy Statements") that it was committed to "good corporate governance," which the Company "believe[d] is important to the success of our business and in advancing shareholder interests," and it identified "integrity," "openness," and "trust" as among the core "behaviors" through which "employees contribute to [FirstEnergy's] success."

48

132.    FirstEnergy expounded on the foregoing in its Corporate Responsibility Reports published in 2019 and 2020.  In the former, the Company touted its "high standard for corporate governance."  And in its 2020 Report, the Company emphasized "FirstEnergy and its Board are committed to upholding high standards for ethics and integrity—the cornerstone of effective corporate governance."  The 2020 Report further states:

- Integrity:  We consistently demonstrate ethical behaviors, values, expectations and outcomes.  We work to create an environment where ethical behaviors are expected.  We have strength of character, strength of will and moral fiber.

- Openness:  We are authentic, humble and true to ourselves.  We communicate openly and honestly.  We actively listen and respond with empathy. . . .

- Trust:  We are honest, reliable, respectful, consistent, dependable and credible.  We are committed to doing what's right.  We respect and trust the capabilities, intention and performance of others.

133.    FirstEnergy's 2017 Proxy Statements further represented that the Company's Code of Business Conduct ("Code of Conduct") "applies to all employees, including the CEO, CFO, and Chief Accounting Officer," and that the Board had a Director Code of Ethics and Business Conduct.  FirstEnergy made virtually identical statements in the 2018 Proxy Statements as well as in preliminary and definitive proxy statements filed with the SEC on March 1, 2019 and April 1, 2019, and on March 4, 2020 and April 1, 2020.

134.    In a version of FirstEnergy's Code of Conduct made available prior to the statements noted above (dated September 15, 2015) but reaffirmed in the published proxy statements identified above, Jones represented:

Maintaining high ethical standards builds trust with our customers, shareholders, fellow employees, and the communities we serve.  At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. . . . It applies equally to all employees of FirstEnergy Corp., including the Chief

49

Executive Officer, Chief Financial Officer and Chief Accounting Officer. . . .

As FirstEnergy employees, we are all responsible for complying with the principles included in this Code. . . .

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity . . . .

In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and employees to fully comply with all applicable laws, regulations and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct. . . .

We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other employees honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud or other unfair business practice. . . .

Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. . . .

Compliance with the Law – Endeavor to comply with both the letter and spirit of all applicable U.S. and foreign laws, rules, and regulations. . . . Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

135.    The version of FirstEnergy's Code of Conduct dated May 26, 2020 contains substantially similar language and includes the following representation disavowing, among other things, the use of "bribes," "kickbacks," and "illegal payments," and highlighting the "special rules [that] apply when dealing with government employees":

50

> You must conduct business, including dealings with the Company's
> customers, suppliers, competitors and other personnel, honestly and
> fairly and not take unfair advantage of anyone through any
> misrepresentations of material facts, manipulation, concealment, abuse
> of privileged information, fraud, bribes, kickbacks, illegal payments,
> cash gifts, cash equivalent gifts or other unfair business practices. Also,
> please be aware that special rules apply when dealing with government
> employees.[95]

136. FirstEnergy's Form 10-K and Form 10-Q filings with the SEC during the

Relevant Period also included statements regarding the Company's and FES's purported

compliance with regulations, orders, policies, and practices prescribed by, among others, the

SEC or PUCO.

137. All of the above statements regarding FirstEnergy's governance, code of conduct,

and compliance efforts were false or misleading when made because senior executives, including

Defendants Jones and Dowling, knew FirstEnergy routinely disregarded prohibitions against

(among other things) bribery and the corruption of public officials—indeed, they were among

those who were regularly flouting those prohibitions. Notably, in its Form 10-Q filed on

November 19, 2020, FirstEnergy effectively admitted those prior representations were false or

misleading:

> The management of FirstEnergy, with the participation of the acting
> chief executive officer and chief financial officer, have reviewed and
> evaluated the effectiveness of its disclosure controls and procedures, as
> defined under the Securities Exchange Act of 1934, as amended (the
> "Exchange Act"), in Rules 13a- 15(e) and 15d-15(e), as of September 30,
> 2020. Based on that evaluation, the acting chief executive officer and
> chief financial officer of FirstEnergy have concluded that its disclosure
> controls and procedures were not effective as of September 30, 2020,

---

[95] FirstEnergy Corp. Policy 101, Code of Business Conduct,
https://www.firstenergycorp.com/content/dam/investor/files/policies-charters/code-of-business-conduct.pdf (May 26, 2020). FirstEnergy made similar representations during the Relevant Period regarding the "Board Code of Conduct," which applied to Jones in his capacity as a director (as well as the Code of Business Conduct, which applied to him and other executives by virtue of their positions as officers).

solely as a result of the material weakness in FirstEnergy's internal control over financial reporting described below. . . .

We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct. . . . [T]his control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.

## V. REVELATIONS IN JULY 2020 AND LATER REGARDING DEFENDANTS' UNLAWFUL CONDUCT CAUSED THE VALUE OF THE MFS FUNDS' INVESTMENTS IN FIRSTENERGY STOCK TO DECLINE

138.    Defendants' misstatements and omissions caused the price of FirstEnergy stock to be artificially inflated throughout the Relevant Period. This artificial inflation was removed starting on July 21, 2020, when the market began learning of facts relating to FirstEnergy's involvement in the massive bribery and money laundering scheme detailed above. Several additional revelations occurred in October and November 2020. Each disclosure caused the price of FirstEnergy shares to decline materially, causing artificial inflation in the stock to dissipate, which resulted in significant damages to the MFS Funds.

### A.    The Market First Learned About the Bribery and Money Laundering Scheme Involving FirstEnergy on July 21, 2020.

139.    On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced it had charged Larry Householder and several accomplices with a federal racketeering conspiracy, and unsealed a detailed 80-page criminal complaint. FirstEnergy separately disclosed it had received federal subpoenas that were clearly related to the Householder charges.

140.    In its press release announcing the federal indictments, the U.S. Attorney's Office stated Householder was "arrested this morning and charged in a federal racketeering conspiracy

involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout." The government also charged (1) Mathew Borges, a lobbyist who previously served as chair of the Ohio Republican Party; (2) Jeffrey Longstreth, Householder's longtime campaign and political strategist who incorporated Generation Now in February 2017; (3) Neil Clark, a lobbyist who owned and operated a consulting firm and previously served as budget director for the Ohio Republican Caucus; (4) Juan Cespedes, a lobbyist; and (5) Generation Now.

141. The U.S. Attorney further disclosed that according to the 80-page criminal complaint unsealed that day, "from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing," and "[t]he defendants then also allegedly worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative to overturn the legislation." The release added that the alleged criminal enterprise "received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period." The market understood that the "energy company" and "affiliates" noted in the press release referred to FirstEnergy and affiliated entities.

142. The press release included additional details regarding the alleged criminal conduct set forth in the FBI affidavit: among other things, that "[i]n March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now," and "[t]he defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they believed would back Householder, and for their own personal benefit." The release (and

affidavit) further disclosed that when asked how much money was in Generation Now, Clark said, "it's unlimited."

143.    The release also cited the following allegations from the affidavit:

- "In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.  The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents.  Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker."

- "Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder."

- "Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt."

- "The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures."

144.    At 4:17 pm EST on July 21, 2020—after the market closed—FirstEnergy published a press release titled "FirstEnergy Corp. Statement on HB 6 Investigation," which stated: "This afternoon, FirstEnergy Corp. (NYSE: FE) received subpoenas in connection with the investigation surrounding Ohio House Bill 6.  We are reviewing the details of the investigation and we intend to fully cooperate."

145.    The price of FirstEnergy stock plummeted in response to the above disclosures, closing at $34.25 on July 21, 2020 and then dropping to a low of $22.85 on July 22, 2020 before "recovering" to close at $27.09, 34% below the stock's closing price of $41.26 per share on

July 20, 2020. FirstEnergy stock traded on extremely heavy volume of approximately 41 million shares on July 21 and nearly 136 million shares on July 22, far above its volume of approximately 2.8 million shares on July 20.

146. Contemporaneous analyst reports confirm that the news of FirstEnergy's involvement in a massive bribery and money laundering scandal caused the decline in FirstEnergy's stock price on July 21 and 22, 2020, and that the market correctly perceived FirstEnergy was the energy company named in the criminal case against Householder and his co-conspirators.

a. On July 22, 2020, Barclays issued an analyst report downgrading its rating of FirstEnergy, explaining that "[f]ollowing a deeper read of the 81-page complaint filed by the FBI," it was "downgrading FE to Equal Weight." Barclays added:

> We see the details of evidence discussed in the complaint as concerning on many levels for FE (although it is not named in the report) and expect the ongoing investigation to focus on the company. A key component of FE's investment thesis is a re-rating opportunity toward regional peers, which we now view as unlikely as negative headlines and investigation updates could continue to weigh on the stock.
>
> We update our price target to $37 and our valuation framework to assume FE trades at a 20% discount to the group average multiple (previously assumed 5% premium) while maintaining all financial estimates: We reiterate our initial reaction outlined in FE: Initial Reaction to Ohio Probe (published 7/21/20), that the immediate financial impacts appear minimal, however after reading through evidence in greater detail – we believe the nature of the allegations and investigation will weigh on sentiment and limit the re-rating opportunity. The investigation also presents a new risk of any activity that may have occurred in prior years and calls HB 6 into question (HB 6 included decoupling provisions in OH). All allegations in the criminal complaint are just allegations, but raise the overall risk profile for FE as the investigation enters its broader public phase and FE faces intense scrutiny.

b. Also that day, Scotiabank issued an analyst report titled "RICO Charges Are Tough to Look Through – Downgrading to Sector Perform," stating in pertinent part:

OUR TAKE: Negative. We are downgrading FE to Sector Perform (from Sector Outperform) as we can no longer recommend the stock after the DOJ/FBI arrests and investigations announced yesterday. Though FE wasn't named explicitly, it's unambiguous to us that FE is the "Company A" referred to in the affidavit. The FBI has outlined probable cause to believe that "Company A" and several OH politicians and lobbyists were engaged in an elaborate "pattern of racketeering activity" related to "bribery" and money laundering, among other crimes. Based on the affidavit and the DOJ/FBI press conference yesterday, we struggle to see a scenario in which shares outperform peers over the next 12 months. Instead, it seems quite likely to us that things will get worse for FE before they get better. We continue to see only modest risk to the company's LT financial outlook and await more details before drawing any concrete conclusions, but we don't expect any anytime soon. As the FBI said yesterday, "this is the end of the beginning", and additional search warrants and subpoenas will be served in the coming days. We have reduced our TP to $39 (from $53), as we now apply a 25% discount to our sector anchor multiple of 19x (from parity previously).

### B. Additional Facts Relating to the Unlawful Scheme Were Revealed in October and November 2020.

147. In October and November 2020, the market learned of additional facts regarding the criminal activities involving FirstEnergy. Those disclosures caused FirstEnergy's share price to decline substantially, resulting in additional damages in connection with the MFS Funds' investments in FirstEnergy stock.

148. On October 29, 2020, Longstreth and Cespedes pled guilty to the charged racketeering conspiracy. Cespedes admitted he committed criminal acts "to conceal the nature, source, ownership, and control of the payments" into Generation Now "in return for specific official action" by Householder "relating to the passage and preservation of legislation that would go into effect and save the operation of [FirstEnergy's nuclear plants in Ohio]."[96]

149. Later that day, after the market closed, FirstEnergy issued a press release announcing the termination of Jones, Dowling, and Dennis M. Chack, Senior Vice President of

---

[96] Plea Agreement at 6, *USA v. Cespedes*, No. 20-cr-77-TSB (S.D. Ohio Oct. 29, 2020).

Product Development, Marketing, and Branding, and noting the Internal Review Committee of FirstEnergy's board had determined those executives had "violated certain FirstEnergy policies and its code of conduct."  Board Chairman Donald Misheff also stated he looked forward to working with Christopher Pappas in his role as Executive Director "to oversee the management team's execution of FirstEnergy's strategic initiatives, engage with the Company's external stakeholders, and *support the development of enhanced controls and governance policies and procedures*."

150.    The market understood the terminations of Jones, Dowling, and Chack as confirming wrongdoing at the Company.  For example, that day Guggenheim issued an analyst report titled "FE: CEO and Two Other Executives Terminated over Internal Investigation," which observed the dismissals "all but confirm[] some degree of impropriety at FE corporate."

151.    Then, in a Form 8-K filed with the SEC on October 30, 2020, FirstEnergy disclosed that following the Internal Review Committee's determination regarding those executives' violations of certain Company policies and its code of conduct, the Company was "re-evaluating its controls framework, which could include identifying one or more material weaknesses."

152.    Also that day, Fitch downgraded the long-term issuer default rating for FirstEnergy and its subsidiaries, and revised its ratings outlook, explaining "[t]he rating actions reflect the termination of three senior executives including former FE CEO Charles E. Jones and two other senior executives and ongoing credit concerns regarding potential illicit activity at FE in connection with an ongoing federal bribery/racketeering investigation."  The report further notes, "While the indictment does not explicitly name FE or its affiliates, pseudonyms referred to in the

affidavit are widely-believed to refer to FE, its corporate services subsidiary, FirstEnergy Service

Company (FESC), and former subsidiary, Energy Harbor."

153.    In response to the revelations on October 29 and 30, 2020, the price of

FirstEnergy stock declined by 6.6% from its close of $31.81 on October 29 to close at $29.72

per share on October 30, on extraordinary trading volume of more than 20 million shares.

154.    On November 13, 2020, the Ohio Attorney General filed a lawsuit in the Court of

Common Pleas, Franklin County, seeking to enjoin Energy Harbor (formerly FES) from

collecting subsidies pursuant to HB 6.

155.    The next trading day, on November 16, 2020, media outlets reported that FBI

agents had raided Randazzo's home.

156.    Following the revelations on November 13 and 16, 2020, the price of FirstEnergy

stock declined by 3.4% from its closing price of $29.51 on November 13 to close at $28.50

per share on November 16, on extraordinary trading volume of more than 11 million shares.

157.    On November 17, 2020, after the market closed, FirstEnergy announced it had

received notice from the NYSE that the Company was not in compliance with continued listing

requirements due to its failure to file a quarterly report for the quarter ended September 30, 2020,

which had been due on November 16, 2020.

158.    On November 19, 2020, FirstEnergy filed with the SEC an amendment to its annual

report for fiscal year 2019 on Form 10-K/A, and belatedly filed with the SEC its quarterly report

on Form 10-Q for the quarter ending September 30, 2020.   In the Form 10-Q, FirstEnergy stated it

was "considering reductions to its Regulated Distribution and Regulated Transmission capital

investment plans and reductions to operating expenses, as well as changes to its planned equity

issuances, to allow for flexibility should a fine be imposed as a result of the government

58

investigation." In its Form 10-K/A, the Company disclosed that management was restating its report on the maintenance of effective internal controls for fiscal 2019 in light of its conclusion that a "material weakness" existed as of December 31, 2019.

159. In both the Form 10-K/A and the Form 10-Q, FirstEnergy disclosed additional details surrounding the Company's termination of Jones and other executives, noting they "did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct." The Company further disclosed that "certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor."

160. FirstEnergy specified that "[a]mong the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013." The Company further noted the counterparty to that agreement "was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates." Additionally, as discussed above (*see* ¶ 137), FirstEnergy admitted that its internal controls had not been effective, the Company's senior executives had "failed to set an appropriate tone at the top," and employees had violated the "Company's policies and code of conduct."

161.    Also on November 19, 2020, *The Associated Press* published a story titled

"FirstEnergy: Ohio regulator's firm got $4 million consulting fee," reporting that Randazzo was

the recipient of the $4 million payment referenced in FirstEnergy's SEC filings:

> Public Utilities Commission of Ohio Chairman Sam Randazzo was not
> mentioned by name in [FirstEnergy]'s tardy quarterly report with the U.S.
> Securities and Exchange Commission.  However, Randazzo fits the description
> of someone who "subsequently was appointed to a full-time role as an Ohio
> government official directly involved in regulating" FirstEnergy.  Randazzo
> was appointed chairman by Republican Ohio Gov. Mike DeWine on Feb. 4,
> 2019.
>
> FBI agents searched Randazzo's Columbus home Monday.  The agency has
> declined to comment on what they are investigating.

162.    On November 20, 2020, Randazzo announced his resignation as PUCO Chairman.

Also that day, Fitch announced it was again downgrading the ratings of FirstEnergy and

FirstEnergy Transmissions LLC, stating the downgrade "reflects recent disclosures of a

$4.3 million payment from FE to an individual who is now a government official involved in

regulating FE's Ohio-based utility distribution subsidiaries," which "significantly deepens

regulatory, political, legal and liquidity risks already heightened by investigations underway at

the Department of Justice (DOJ) and SEC."

163.    In response to the revelations on November 19 and 20, 2020, the price of

FirstEnergy stock declined by 3.6% from its closing price of $29.04 on November 19 to close at

$28.00 per share on November 20, on extraordinary trading volume of more than 23 million

shares.

164.    On November 24, 2020, FirstEnergy announced that it and FirstEnergy

Transmission, LLC had drawn down nearly $2 billion under their respective credit facilities to

"preserve financial flexibility."  The drawdown was widely viewed in the market as preparation

for a large fine or monetary penalty.  In that regard, during FirstEnergy's earnings call a few

weeks earlier (on November 2, 2020), in response to an analyst's question about financing a potential fine or penalty from a balance sheet perspective, Defendant Jon Taylor stated "I think that's why we're taking the steps that we are taking now to provide additional balance sheet flexibility."

165. Following the November 24, 2020 disclosure, rating agencies downgraded FirstEnergy's rating to junk status. Specifically, that day Moody's announced it was downgrading "[a]pproximately $10 billion of FirstEnergy debt securities," explaining its rating actions "reflect our view that regulatory scrutiny in Ohio is likely to increase, potentially resulting [in] negative financial implications for both FirstEnergy and its Ohio utility subsidiaries." Moody's further noted the rating actions "reflect higher corporate governance risk, resulting from FirstEnergy's lack of oversight of internal controls." A Moody's analyst stated, in pertinent part:

> The disclosure of a payment by FirstEnergy to a government official who directly regulated the company's Ohio utilities is likely to increase both regulatory risk and financial uncertainty for both FirstEnergy and its Ohio utility subsidiaries. Furthermore, FirstEnergy's decision to draw down $2 billion on its credit facilities is viewed as unusual behavior for an investment grade utility holding company. It was done to preserve liquidity but could be a sign that additional negative developments related to corporate governance may occur, possibly limiting access to these credit facilities of the capital markets.

166. In response to the news on November 24, 2020, the price of FirstEnergy shares dropped by approximately 3.8% from its close of $27.71 on November 23, to close at $26.66, on extraordinary trading volume of more than 14 million shares.[97]

---

[97] Additionally, on November 25, 2020, S&P Global Market Intelligence issued an announcement titled "S&P downgrades FirstEnergy following $1.95B draw on revolving credit facility," explaining: "Although we believe the company's decision to significantly increase its borrowings under its revolving credit facility demonstrates prudent risk management given the unique challenges the company is facing, in our view, it is also an acknowledgment that the company may not have consistent access to the capital markets."

61

167.    The stock price declines in July, October, and November 2020 referenced above did not result from market-wide developments, or disclosures specific to FirstEnergy or its affiliates, that are unrelated to Defendants' misconduct detailed in this Complaint.  Rather, the declines resulted from revelations to the market that Defendants' prior representations regarding FirstEnergy's business and operations—including its purported commitment to integrity; policies and controls purportedly in place with respect to political activities and contributions; the Company's efforts to obtain a legislative or regulatory solution to problems relating to the nuclear plants; and the purported benefits of HB 6—were materially false or misleading when made.

### C.    Additional Developments After the Relevant Period Further Demonstrate Defendants' Wrongdoing and the Harm It Caused to Investors.

168.    Additional revelations in the months following the above disclosures further confirmed the nature and scope of Defendants' misconduct and its significant impact on FirstEnergy shareholders, including the MFS Funds.

169.    Starting on July 27, 2020, FirstEnergy customers began filing class actions against FirstEnergy, asserting claims for violations of RICO and state laws.  FirstEnergy's motion to dismiss in the RICO case was denied in February 2021, and the case is proceeding through discovery.

170.    On September 15, 2020, PUCO opened a new proceeding to review the political and charitable spending by FirstEnergy and its Ohio utilities in support of HB 6 and the subsequent referendum effort, directing those companies to show that the costs of any political or charitable spending in support of HB 6 or the subsequent referendum effort were not included, directly or indirectly, in any rates or charges paid by ratepayers.

171.    On September 23, 2020 and October 27, 2020, the Ohio Attorney General and the cities of Cincinnati and Columbus, respectively, filed complaints against several parties, including FirstEnergy, each alleging civil violations of the Ohio Corrupt Activity Act in connection with the passage of HB 6.

172.    On November 4, 2020, PUCO initiated an additional corporate separation audit as a result of FirstEnergy's October 29, 2020 termination of Jones and Dowling, among others.

173.    On December 30, 2020, PUCO reversed the decision made during Randazzo's chairmanship to waive the requirement for a distribution rate in 2024.  As a result, FirstEnergy now has to file a distribution rate case by May 31, 2024, but against the backdrop of the Company's infamous bribery of Ohio public officials.  Also on December 30, PUCO reopened the distribution modernization rider ("DMR") audit docket Randazzo had helped stop, and directed PUCO staff to solicit a third-party auditor and conduct a full review of the DMR to ensure that funds collected from ratepayers through the DMR were only used for the purposes established in FirstEnergy's Electric Security Plan IV as stipulated with PUCO.[98]

174.    On January 13, 2021, the Ohio Attorney General filed a motion for a temporary restraining order and preliminary injunction against FirstEnergy, seeking to enjoin the Company from collecting the decoupling rider pursuant to HB 6.

175.    On January 26, 2021, staff of the Division of Investigations at FERC issued a letter directing FirstEnergy to preserve and maintain all documents and information related to an ongoing audit being conducted by FERC's Division of Audits and Accounting, including activities related to lobbying and governmental affairs activities concerning HB 6.

---

[98] In its press release, PUCO noted "[t]he distribution modernization rider, billed to customers from January 2017 through July 2, 2019, was designed to support the utilities' efforts to pursue grid modernization investments."

176.     On or about February 1, 2021, FirstEnergy reached a partial settlement with the Ohio Attorney General and the cities of Cincinnati and Columbus with respect to the temporary restraining order and preliminary injunction request and related issues.  In connection with the partial settlement, FirstEnergy and its Ohio utilities filed an application with PUCO on February 1, 2021 to set their respective decoupling riders to zero, which PUCO approved the next day, thereby ensuring that no additional customer bills would include new decoupling rider charges after February 8, 2021.  FirstEnergy also agreed it would not seek to recover lost distribution revenue from residential and commercial customers.  As a result, FirstEnergy recognized a $108 million pre-tax ($84 million after-tax) charge in the fourth quarter of 2020, $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue.  The Ohio Attorney General issued a press release stating FirstEnergy's partial settlement agreement is projected to save Ohioans nearly $2 billion over the period HB 6 would have been effective.

177.     On March 31, 2021, Ohio Governor Mike DeWine signed a bill repealing several pertinent provisions of HB 6, including nuclear subsidies and the decoupling provision.  Also that day, FirstEnergy declared it would refund $26 million collected under HB 6's decoupling provision.

## VI.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

178.     A presumption of reliance with respect to Plaintiffs' Exchange Act claims is appropriate under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, FirstEnergy stock traded at artificially inflated prices during the Relevant Period on markets that were open, well-developed, and efficient at all times.  The MFS Funds purchased FirstEnergy securities relying on the integrity of the market prices of those securities and public information relating to FirstEnergy, and have been damaged as a result of Defendants' false or misleading statements or omissions.

179.    At all relevant times, the markets for FirstEnergy securities were efficient, for the following reasons, among others:

      a.    FirstEnergy stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.    As a regulated issuer, FirstEnergy filed periodic public reports with the SEC and the NYSE;

      c.    FirstEnergy securities were rated by nationally recognized credit rating agencies, including Moody's and Standard & Poor's Rating Services;

      d.    FirstEnergy regularly communicated with public investors via established market communication mechanisms, including regularly disseminating releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      e.    FirstEnergy was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, and those reports were publicly available and entered the public marketplace.

180.    As a result of the foregoing, the market for FirstEnergy stock promptly digested current information regarding FirstEnergy from all publicly available sources and reflected that information in the price of FirstEnergy shares.

181.    A presumption of reliance with respect to Plaintiffs' Exchange Act claims is also appropriate under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent those claims arise from material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding FirstEnergy's business operations, financial results, and prospects—information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' statements and omissions detailed above, that requirement is satisfied here.

182.     At the times they purchased FirstEnergy stock, the MFS Funds lacked knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not reasonably have discovered those facts.

## VII.    DEFENDANTS ACTED WITH SCIENTER

183.     As detailed above, Defendants defrauded investors by misstating or failing to disclose material facts regarding FirstEnergy's payments to public officials, political contributions as well as purported policies and controls relating to such contributions, the Company's internal controls, and the risks of investing in FirstEnergy.  The Individual Defendants were personally aware of, or were severely reckless in disregarding, the bribery and money laundering activities detailed in Sections IV.A.2 and IV.B.2-3 above, and/or otherwise participated in a scheme to defraud investors.  Further, the Individual Defendants had significant motives to engage in the fraudulent conduct.

184.     Additionally, the sheer magnitude of the illegal conduct alleged in this Complaint—which FirstEnergy has largely *admitted*—strongly indicates all of the Defendants actively participated in the misconduct or at least knew of or recklessly disregarded it.  It is implausible to conclude that a bribery and money laundering scheme involving tens of millions of dollars and spanning several years was unknown to FirstEnergy's senior executives.  That is particularly so given the importance to the Company of pursuing legislative and regulatory "solutions" to the problems relating to the Nuclear Plants.  The following admissions by FirstEnergy in the Deferred Prosecution Agreement further confirm Defendants' scienter:

a.     FirstEnergy's 2017 payments "were intended to contribute to [Householder]'s power and visibility for the speakership and allowed him to support other candidates who would in turn support his speakership.  In return, FirstEnergy Corp.

66

expected and intended that [Householder] and his team would further FirstEnergy Corp.'s efforts to save the power plants."[99]

      b.     "From when House Bill 6 was introduced in April 2019 to October 2019, FirstEnergy Corp. worked directly with FES to support [Householder] through payments to Generation Now with the intent and for the purpose that, in return, [Householder] would take specific official action relating to the passage of House Bill 6 and the defeat of the ballot referendum initiative to overturn House Bill 6. FirstEnergy Corp. paid the money to [Householder] through Generation Now intending to influence and reward [Householder] in connection with passage of House Bill 6 and defeating the ballot referendum."[100]

      c.     "FirstEnergy Corp. paid the entire $4,333,333 to Company 1 for [Randazzo]'s benefit with the intent and for the purpose that, in return, [Randazzo] would perform official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose."[101]

185.    In addition to these facts, as well as the numerous other facts detailed in Sections IV.A.2 and IV.B.2-3 above, which demonstrate Defendants' scienter, the following examples clearly evidence Defendants' knowledge (or, in some cases, at least reckless disregard) of the underlying misconduct that rendered Defendants' representations to investors materially false or misleading when made.

---

[99] DPA SOF at 21.

[100] *Id.* at 26.

[101] *Id.* at 35.

### A.     Jones's Scienter

186.     In addition to the quoted misstatements from earnings calls and news articles that are directly attributed to him in Sections IV.A.1 and IV.B.1 above, Jones signed numerous FirstEnergy SEC filings containing false or misleading statements, including the Company's 2016, 2017, 2018, and 2019 Form 10-Ks.

187.     Additionally, the following admissions by FirstEnergy in connection with its Deferred Prosecution Agreement confirm Jones's malfeasance:

a.     On March 7, 2017, Dowling received an email with "wiring instructions for Generation Now" noting "'[t]his is the organization that [Jones] and [Householder] discussed.'"[102]

b.     "In October 2018, FES paid Generation Now another $500,000 for [Householder]'s benefit – $400,000 of which was hand-delivered to [Householder] during an in-person meeting on or about October 10, 2018.  On October 2, 2018, about a week before the payment, [Dowling] told [Jones], 'I know you know this, but this is where companies and people get in political trouble – everyone is in a rush and they all need a ton of hel$p. Let me gather everything. I'll bring it to you and you/we can decide.' On October 10, 2018, the day of the meeting, [Jones] texted [Dowling], 'FES meeting with [Householder] today. I told him to be nice but listen to us.' [Dowling] replied, 'He'll learn about the $400k at this mtg.' [Jones] then responded, 'They better get it done quick or he won't be able to spend it.' Following the meeting, [Householder] thanked [Jones] via text for the money from FES, stating, '$400k… thank you.'"[103]

---

[102] *Id.* at 16.

[103] *Id.* at 23-24.

c.      On December 19, 2018, after meeting with Randazzo to discuss the open PUCO commissioner seat, Jones told Randazzo that FirstEnergy intended to pay the full notational value for several years of unperformed service, despite there being no legal requirement for the payment. When doing so, he clearly insinuated that Randazzo should remember the payment and reward FirstEnergy, stating: "We're gonna get this handled this year, paid in full, no discount. Don't forget about us or Hurricane [Jones] may show up on your doorstep! Of course, no guarantee he won't show up anyway."  Randazzo confirmed his intention to open doors at PUCO for FirstEnergy, stating: "Made me laugh – you guys are welcome anytime and any whereI [sic] can open the door. Let me know how you want me to structure the invoices. Thanks."

d.      In April 2019, around the time HB 6 was introduced, Jones stated to Householder regarding the transactional nature of their relationship: "I would say you are a bargain – not cheap."[104]  The use of the word "bargain" confirms Jones's understanding that FirstEnergy was paying Householder for a direct economic benefit.

e.      On July 23, 2019, the day HB 6 was signed into law, Jones wrote to Dowling: "We made a bbiiiiiiiig bet and it paid off. Actually, 2 big bets."[105]  This statement also confirms that Jones viewed the millions of dollars paid to Householder as a large economic investment that "paid off" in the form of HB 6's passage.

f.      Also on July 23, 2019, Jones "sent to [Randazzo] a photo-shopped image of Mount Rushmore with the face of [Randazzo], alongside [Dowling], Ohio Director of State Affairs, and Company C Executive, imposed over the four presidential faces with

---

[104] *Id.* at 27.

[105] *Id.* at 30.

69

the caption, 'HB 6 F[---] ANYBODY WHO AINT US.'"[106]  This message confirmed not only that Jones understood FirstEnergy was the intended beneficiary of HB 6, but also that Randazzo had colluded with Dowling to design the bill.

        g.     In 2019, Jones directly admitted the purpose of corrupting public officials was to inflate FirstEnergy's stock price: "On November 10, 2019, [Jones] texted Company C Executive, 'And, the FE rescue project is not over. At EEI financial conference. Stock is gonna get hit with Ohio 2024. Need [Randazzo] to get rid of the "Ohio 2024" hole.' . . . On November 22, 2019, approximately a day after PUCO's rate case policy change benefitting the energy company, and the day after news of the decoupling rider application became public, [Jones] thanked [Randazzo] via text message. Specifically, [Jones] texted [Randazzo] an image showing FirstEnergy Corp.'s stock increase with a note that stated, 'Thank you!!' [Randazzo] responded, 'Ha – as you know, what goes up may come down. [Name] helped. Thanks for the note. Spoke to [name] last night.' [Jones] replied, 'Every little bit helps. Those guys are good but it wouldn't happen without you. My Mom taught me to say Thank you,' to which [Randazzo] replied, 'Thanks.'"  (Eighth and ninth alterations in original.)[107]

188.    Several other facts confirm Jones's participation in, and direct knowledge of, FirstEnergy's bribery of Householder and Randazzo.

        a.     On October 29, 2020, FirstEnergy took the extraordinary step of terminating Jones with immediate effect because of his violation of Company policies. As FirstEnergy explained in its November 19, 2020 Form 10-Q, Jones and two other

---

[106] *Id.* at 41.

[107] *Id.* at 42.

terminated executives "did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct," and "did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor."  The Company further specified "certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013," and the counterparty to that agreement "was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates"—in other words, Randazzo.

b.      After Householder was arrested and the fraudulent scheme perpetrated by Defendants began to unravel, Jones lied to cover-up his wrongdoing.  During an investor call immediately after the arrests, Jones claimed, "I don't know who" is the "CEO [of Company A]" referred to in the criminal complaint, "but it was not me."  Jones's purported ignorance was belied by the criminal complaint's direct quotes of his past statements, attributed to "Company A Corp.'s CEO," which left no doubt about the CEO's identity.  Indeed, the criminal complaint details that Jones had 84 phone contacts with Householder during the Relevant Period, while FirstEnergy was funneling tens of millions of dollars to Householder and other members of the criminal enterprise.

c.      Jones sold large amounts of FirstEnergy stock during the Relevant Period at prices that were artificially inflated due to Defendants' false or misleading statements. Specifically, Jones sold 116,045 shares at $32.48 on March 1, 2018, and 148,302 at $40.73 on March 1, 2019, for a total of $9,809,482. Those sales comprised approximately 39% of Jones's FirstEnergy stock holdings during the Relevant Period, and were suspicious in both timing and amount. Based on the corresponding Form 4s filed with the SEC, those sales represented a substantial portion of Jones's FirstEnergy holdings. Further, those sales were unusual in timing: in contrast to the nearly 265,000 shares of FirstEnergy stock Jones sold during the Relevant Period, he did not sell any FirstEnergy stock during the 18 months immediately preceding the Relevant Period. Additionally, Jones's stock sales during the Relevant Period were more than 700% greater in terms of volume than his sales during the 45 months immediately preceding the Relevant Period, and were nearly double the number of FirstEnergy shares he sold during the ten years before the Relevant Period.

**B.      Dowling's Scienter**

189.   The following admissions by FirstEnergy in connection with the Deferred Prosecution Agreement likewise confirm Dowling's knowledge of the scheme to bribe Householder and Randazzo:

a.      "[Dowling] had outlined in an internal presentation . . . that 2017 political contributions are 'strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation' and that FirstEnergy Corp.'s 'preferred manner of giving is through section 501(c) groups, as these are considered "dark money" because they are not required to disclose where the donations

come from." The presentation noted that 'the bulk of our contribution decisions are to c(4)s.'"[108]

b. On March 7, 2017, Dowling received an email with "wiring instructions for Generation Now" noting "'[t]his is the organization that [Jones] and [Householder] discussed.' In response, [Dowling] forwarded the email internally, and carbon copied Individual A, stating, 'Let's do $250,000 asap and we will do $1M by year-end 2017.' Similarly, on August 1, 2017, [Dowling] asked, 'Are we at $500k for the c(4) now?' to which Individual A replied, 'Yes.'"[109]

c. On August 5, 2018, Dowling told Jones: "'[Householder] wants to hear about us – status of company, what's important to us this year and next year. Money will come up – help with key races and C(4).' Following a meeting involving [Jones] and [Householder], on or about August 16, 2018, FirstEnergy Corp. wired $500,000 from Partners for Progress to Generation Now for [Householder]'s benefit."[110]

d. "In October 2018, FES paid Generation Now another $500,000 for [Householder]'s benefit – $400,000 of which was hand-delivered to [Householder] during an in-person meeting on or about October 10, 2018. On October 2, 2018, about a week before the payment, [Dowling] told [Jones], 'I know you know this, but this is where companies and people get in political trouble – everyone is in a rush and they all need a ton of hel$p. Let me gather everything. I'll bring it to you and you/we can decide.' On October 10, 2018, the day of the meeting, [Jones] texted [Dowling], 'FES meeting with [Householder] today. I told him to be nice but listen to us.' [Dowling] replied, 'He'll

---

[108] *Id.* at 21.

[109] *Id.* at 16.

[110] *Id.* at 22-23.

learn about the $400k at this mtg.' [Jones] then responded, 'They better get it done quick or he won't be able to spend it.' Following the meeting, [Householder] thanked [Jones] via text for the money from FES, stating, '$400k… thank you.'"[111]

      e.      Dowling was with Jones during the December 17, 2018 meeting with Randazzo to discuss the open PUCO commissioner seat.  Dowling was also a recipient of the December 19, 2018 text messages in which Jones told Randazzo that FirstEnergy intended to pay the full notational value for several years of unperformed service, despite there being no legal requirement for the payment, and in which Jones stated "[d]on't forget about us or Hurricane [Jones] may show up on your doorstep," and Randazzo stated "you guys are welcome anytime and any whereI [sic] can open the door."[112]

      f.      On July 23, 2019, the day HB 6 passed, Dowling stated to Jones: "Huge bet and we played it all right on the budget and HB 6 – so we can go back for more! . . ."[113]

      g.      The criminal complaint against Householder and others references records indicating Dowling had at least 14 phone contacts with Householder, as well as several additional calls with other co-conspirators regarding the bribery and money laundering scheme, many of which occurred in conjunction with payments from FirstEnergy to fund the scheme.  For example, on March 12 and 13, 2018, Dowling had five telephone communications with Householder.  Two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle.  Similarly, between April 27 and

---

[111] *Id.* at 23-24.

[112] *Id.* at 35-36.

[113] *Id.* at 30.

April 30, 2018, Dowling had seven telephone communications with Householder's colleague Jeffrey Longstreth, followed shortly by a $100,000 payment by FirstEnergy to members of the criminal enterprise on May 4, 2018.[114]

h.      On October 29, 2020, FirstEnergy took the extraordinary step of terminating Dowling with immediate effect because of his violation of Company policies. FirstEnergy then explained in its November 19, 2020 Form 10-Q that Dowling "did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct," and "did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor."  The Company further specified "certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013," and indicated Randazzo (whom the Company described as "an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates") was the beneficiary of that payment.

**C.      Pearson's Scienter**

190.      In addition to making the statements on calls with investors and analysts as described above, Pearson signed several of FirstEnergy's SEC filings containing false or

---

[114] Affidavit in Support of a Criminal Complaint at 26-27, *USA v. Borges*, No. 1:20-mj-00526 (S.D. Ohio July 17, 2020).

misleading statements during the Relevant Period, including all the Form 10-Ks and Form 10-Qs from the beginning of the Relevant Period until March 2018, when he stopped serving as CFO.

191.    Pearson served as FirstEnergy's CFO until March 2018, at which time he transitioned to its Vice President of Finance to focus "his utmost attention" on dealing with the Nuclear Plants until his retirement in April 2019.[115]  Pearson was a member of the Restructuring Working Group overseeing the Company's restructuring of FES.  In those roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk, investor disclosures, and efforts to eliminate the Company's liability exposure to the Nuclear Plants.  As a result, Pearson was directly involved in and intimately familiar with key aspects of the scheme to bribe Householder and Randazzo.  Pearson reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's bribes.

192.    Further, during the Relevant Period until his transition to Vice President of Finance, Pearson certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete, and fairly presented in all material respects the Company's financial position.  He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed, and effective to ensure accurate financial reporting and internal fraud detection.  FirstEnergy would later admit that its internal controls were deficient, in direct contradiction of Pearson's certifications.

---

[115] FirstEnergy 4Q 2017 Earnings Call (Feb. 21, 2018).

193.     Pearson's stock sales also evidence his scienter.  On January 9, 2019, before the revelations of FirstEnergy's bribery of Householder and Randazzo, Pearson sold 40,000 shares at the artificially inflated price of $37.87 for a total of $1,514,800.  Those sales amounted to approximately 28% of Pearson's holdings.  Pearson's trades were unusual, as he did not engage in any trading in FirstEnergy stock over the 45 months preceding the Relevant Period.

### D.     Strah's Scienter

194.     In addition to making the false or misleading statements on calls with investors and analysts as described above, Strah signed several of FirstEnergy's SEC filings containing false or misleading statements during the Relevant Period, including all the Form 10-Ks and Form 10-Qs between March 2018 and the end of the Relevant Period.

195.     Strah served as Vice President of FirstEnergy's Utilities Operations until March 2018, at which time he transitioned to CFO before assuming the role of President of FirstEnergy in May 2020.  In those roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk and investor disclosures.  Strah reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's bribery and money laundering scheme.  During the Relevant Period, Strah certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete, and fairly presented in all material respects the Company's financial position.  He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed, and effective to ensure accurate financial reporting and internal fraud detection.  FirstEnergy would later admit that its internal controls were deficient, in direct contradiction of Strah's certifications.

### E.    Taylor's Scienter

196.    Taylor took over as FirstEnergy's CFO from Strah.  Taylor previously served as the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations.  During his time as Controller and Chief Accounting Officer in the Relevant Period, Taylor signed FirstEnergy's Form 10-Ks and 10-Qs containing false or misleading statements as described above.

### F.    Schneider's Scienter

197.    In addition to the quoted false or misleading statements from earnings calls and news articles that are directly attributed to him above, Schneider signed several of FirstEnergy's SEC filings containing false or misleading statements, including the 2016 Form 10-K, the 2017 Form 10-Qs, and the 2017 Form 10-K.

198.    Schneider served as CEO and Chairman of FES at the start of the Relevant Period.  He remained CEO of FES until March 2019 and remained FES's Chairman until FES completed its bankruptcy restructuring.  In those roles, Schneider facilitated FES's participation in the bribery and money laundering scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy, and efforts to find "solutions" for the Nuclear Plants.  As part of Chuck Jones's plan to create the appearance of FES independently supporting Householder (captured in a recorded phone conversation involving co-conspirator Juan Cespedes), Schneider directed FES to retain one of the scheme's most important lobbyists: Mathew Borges.  Schneider retained Borges in close consultation with FirstEnergy and the Company's other senior executives involved in the bribery and money laundering scheme, including Jones.  As a result, Schneider was directly involved in the scheme and intimately familiar with its operations.

### G.    Judge's Scienter

199.    As discussed above, Jones made false or misleading statements regarding HB 6 that were publicly disseminated to investors.

200.    In his roles as CEO and President of Energy Harbor (formerly FES) and Chief Risk Officer of FirstEnergy, Judge facilitated FES's participation in the bribery and money laundering scheme detailed above through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy, and efforts to find "solutions" for the Nuclear Plants.

201.    Judge met with Householder to discuss the bailout scheme, including in March 2019 at Vern Riffe State Officer Tower in Columbus, Ohio.  As part of Jones's plan to create the appearance that FES was independently supporting Householder (captured in a recorded phone conversation involving Cespedes), Judge directed FES to retain Cespedes.  Judge did so in close consultation with FirstEnergy and the Company's other senior executives involved in the bribery and money laundering scheme, including Jones.  Judge periodically met with Cespedes to receive updates on the scheme, including during the March 2019 meeting referenced above, which Cespedes attended, and during a November 2019 dinner attended by Judge, Cespedes, and other members of the criminal enterprise.

202.    Additionally, Judge directed and oversaw the use of FES employees in commercials opposing the repeal of HB 6 as part of the misleading campaign opposing the repeal effort.

## VIII.   CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5
### (Against All Defendants)

203.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-202 above as if fully set forth in this paragraph.

204.    During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were false or misleading in that they misstated or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit related to the MFS Funds' purchase or acquisition of FirstEnergy stock.

206.    In addition to the duties of full disclosure imposed on Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) to promptly disseminate truthful information with respect to FirstEnergy's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

207.     As a direct and proximate result of Defendants' wrongful conduct, the MFS Funds suffered damages in connection with their purchases or acquisitions of FirstEnergy stock during the Relevant Period.  The MFS Funds paid artificially inflated prices for FirstEnergy stock and experienced losses when the artificial inflation was removed from the stock price as a result of the revelations and price declines detailed in this Complaint.  The MFS Funds would not have purchased or acquired FirstEnergy stock at the prices they paid, or at all, had they been aware that those prices had been inflated by Defendants' false or misleading statements and omissions.

208.     By virtue of the conduct alleged in this Complaint, Defendants have each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and are liable to Plaintiffs.

## COUNT II
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against All Defendants)

209.     Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-202 above as if fully set forth in this paragraph.

210.     During their tenures as officers or directors of FirstEnergy during the Relevant Period, the Individual Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers or directors of FirstEnergy, these Defendants had the power and authority to cause the Company to engage in the conduct detailed in this Complaint.  These Defendants were able to, and did, control, directly and indirectly, the decision-making of FirstEnergy, including the content and dissemination of the Company's filings and other public statements described in this Complaint, thereby causing the dissemination of the materially false or misleading statements and omissions as alleged in this Complaint.

211.     FirstEnergy exercised control over and directed the actions of its senior managers, directors, and agents, including the Individual Defendants.  FirstEnergy controlled the Individual Defendants, as well as all of the Company's employees, subsidiaries, and affiliates, including FES.

212.     In their capacities as senior corporate officers or directors of FirstEnergy during the Relevant Period, and as more fully described throughout this Complaint, the Individual Defendants participated in the misconduct set forth above.  These Defendants had direct and supervisory involvement in the day-to-day operations of FirstEnergy, and had access to non-public information regarding the Company's deceptive and risky business practices.  FirstEnergy and the Individual Defendants had the ability to influence and direct, and did influence and direct, the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, as detailed in this Complaint.

213.     As a result, FirstEnergy and the Individual Defendants, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

214.     As set forth above, FirstEnergy violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, FirstEnergy is liable to Plaintiffs.  Additionally, FirstEnergy exercised control over the Individual Defendants as well as all of the Company's employees, subsidiaries, and affiliates, and is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Individual Defendants are liable to Plaintiffs.

215.     By reason of the foregoing, Defendants violated Section 20(a) of the Exchange Act (15 U.S.C. § 78(a)), and are liable to Plaintiffs.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, as allowed by law;

B.    Awarding Plaintiffs extraordinary, injunctive, or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as this Court may deem just and proper.

## X.    JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: December 17, 2021

By:  */s Matthew L. Fornshell*

ICE MILLER LLP

Matthew L. Fornshell (0062101)
    TRIAL ATTORNEY
Nicole R. Woods (0084865)
250 West Street, Suite 700
Columbus, OH 43215-7509
Tel.:  (614) 462-1061
Fax:  (614) 222-3692
matthew.fornshell@icemiller.com
nicole.woods@icemiller.com

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

Steven E. Fineman (*pro hac vice* forthcoming)
Daniel P. Chiplock (*pro hac vice* forthcoming)
Michael J. Miarmi (*pro hac vice* forthcoming)
John T. Nicolaou (*pro hac vice* forthcoming)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.:  (212) 355-9500
Fax:  (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com
jnicolaou@lchb.com


Richard M. Heimann (*pro hac vice* forthcoming)
Bruce W. Leppla (*pro hac vice* forthcoming)
Sharon M. Lee (*pro hac vice* forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.:  (415) 956-1000
Fax:  (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com
slee@lchb.com

*Attorneys for Plaintiffs*